THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. KENNETH FISHER, Defendant-Appellant.

First District (2nd Division)   No. 85—2616

Opinion filed May 3, 1988.—Rehearing denied May 24, 1988.

William A. Swano, of Chicago, and Timothy P. O'Neill, of O'Neill & Rutherford, of River Forest, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Rimas F. Cernius, and Nancy Black, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Defendant, Kenneth Fisher, and his cousin, Johnny McGhee, were jointly indicted for murder, armed robbery, robbery, attempted rape and unlawful restraint. A defense motion for severance was granted. After an extensive hearing, the trial court granted defendant's motion to suppress a written confession, but denied his motion to suppress certain oral statements. Prior to trial, the State nol-prossed the unlawful restraint charge. At defendant's jury trial, the court directed a verdict in favor of the defendant on the charges of armed robbery, robbery, murder predicated on armed robbery, and murder predicated on robbery. The jury returned a verdict of guilty of murder and attempted rape. After denying defendant's motion for a new trial, the court sentenced defendant to 60 years for murder and 15 years for attempted rape, the sentences to run concurrently. McGhee was tried

separately and is not involved in this appeal.[1]

On May 27, 1984, at about 8:30 a.m., some boys discovered the body of the victim, Thelma Fisher. Clues found at the scene led police to Troy Fisher, the victim's father, and Shirley Forrester, who is the mother of defendant Kenneth Fisher and the aunt of the victim. The victim was the cousin of the defendant. Both parents, Troy Fisher and Shirley Forrester, told the police that the last time they saw the victim was the night before. She was in the company of defendant Fisher, Johnny McGhee and Marilyn Green. Defendant's mother told the police that her son was in custody at the 13th District police station on an unrelated theft charge.

The first police contact with the defendant was made at 1 p.m. at the 13th District station, approximately 4½ hours after the victim's body was discovered. They saw defendant in the lock-up. He was not wearing a shirt, his pants were full of blood from the knees down, his gym shoes had blood on the tongue area, top and sides. Defendant was read his rights and agreed to answer questions. He said he was with the victim, a girlfriend and McGhee the previous night. He was then transferred to Area 4 Headquarters.

As detectives inventoried defendant's clothing, they noticed a plastic bag of marijuana protruding from his underwear. The front and rear of his underwear was bloodstained and both of his knees were scraped. Photos were taken of his knees.

Next, the detectives located defendant's car and found blood on the hood, right front hubcap and rear. A leather, metal-studded bracelet, which was also bloodstained, was found in the car. A stereo speaker appeared to have been removed. It was found in the trunk. It had wires similar to those found at the crime scene.

At about 5:30 p.m., the detectives spoke to Marilyn Green, who told them that she was with the victim, defendant and McGhee the previous evening. Prior to joining the defendant and McGhee, she and the victim went to a girlfriend's home, where the victim took a shower, put on a new bra and new underwear and fresh clothes. They later met defendant and McGhee, whom the victim introduced as her cousins. After visiting some taverns and drinking, Ms. Green was taken home. During the evening, they ran into the victim's father and the defendant stopped at home briefly and argued with his pregnant wife. The last thing she heard defendant say to the victim as he drove

---

[1]McGhee was convicted by a jury, and on appeal, this court reversed and remanded. *People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, *appeal denied* (1987), 116 Ill. 2d 570.

away was "we have something to do" and the victim yelled "[H]ey, wait a minute."

The detectives next spoke with defendant at about 7 p.m. after reading him his *Miranda* rights. At this time, the defendant told them that he, McGhee and the victim had been where the victim's body was found the evening before. The defendant claimed that he saw his marijuana tucked into the victim's waistband and the two argued over it. During the course of the argument, defendant reached down, picked up a rock and hit the victim in the forehead, causing her to fall. Next, defendant stated that McGhee got some stereo speaker wire and began to tie the victim up. McGhee then picked up a larger rock and struck the victim five or six times and then dropped the rock on her face. Defendant picked the rock up off her face. He noticed that the victim was wearing a studded leather bracelet that he had given her and he removed it from her hand. Then defendant and McGhee drove off.

Later during the evening of May 27, 1984, Assistant State's Attorney John Hynes arrived at the station where the defendant and McGhee were being held. He spoke with the defendant after reading him his *Miranda* rights. Their first meeting took place at about 1 a.m. on May 28, 1984.

At this time, defendant repeated his prior story, adding that before leaving the scene, he checked to see if the victim was still alive and it appeared that she was not breathing. Defendant drank another beer, and while driving away, he looked through the victim's purse and threw it out the car window.

After speaking with McGhee, Mr. Hynes returned to speak yet again with defendant. After his *Miranda* rights were read, defendant admitted that he may have struck the victim twice and that he may have tied the wire around the victim's wrist. All of the defendant's oral statements were admitted in evidence at trial.

Dr. Yuksel Konacki, of the medical examiner's office, testified that he performed a postmortem examination on Thelma Fisher. His initial exam revealed that her body was bloody, partially covered with mud and it showed multiple injuries, many lacerations, abrasions and contusions. His examination further revealed at least 15 lacerations to the head caused by blunt trauma. Additionally he noted two lacerations to the mouth and four to the chin, all caused by blunt trauma. He further noted six parallel abrasions to the left side of her neck caused by pressure applied to her neck, possibly with a cord. Additionally, her left clavicle was fractured. Also, there were several abrasions on both sides of her chest. Dr. Konacki testified that these in-

juries were consistent with blows from the small rock and larger boulder-type rock that were recovered from the scene. Additionally, there were marked facial bone fractures. Dr. Konacki also found contusions and abrasions on her right elbow, left hand, right wrist, right hand, left thigh and the front of both legs. Her right index finger was broken at the base.

Dr. Konacki further found several hemorrhages on the surface of the victim's eyes. Additional hemorrhages were found inside her neck and around and on the larnyx and trachea. These were all consistent with strangulation or asphyxiation. The victim also suffered from a y-shaped skull fracture that was imposed prior to her death. He also noted several contusions and hemorrhages on the base of her brain. In the area of her neck, her hyoid bone was fractured on the right side. This fracture is consistent with strangulation. Also, there were hemorrhages on her tongue. In his opinion, these injuries occurred prior to her death. He also observed several areas of hemorrhages to her heart.

Dr. Konacki testified that the victim's death was caused by asphyxia due to strangulation with cranial cerebral injury and internal chest injuries due to blunt trauma.

Sharon Ellis-Williams testified that she is a Chicago police officer assigned to the crime lab. She testified to various tests she conducted on the evidence in this case. Initially she testified that the victim's blood was Type A. Both defendant's and McGhee's are Type O. Ms. Williams went on to explain how these types are mutually exclusive relative to the tests she conducted. The victim's fingernail clippings revealed dirt, rocks and blood. Her hair also revealed dirt, rocks and blood. Additionally, her pubic hair showed blood. Ms. Williams also found blood on the victim's bra, purse, shoes, comb and coat. Due to the fact that these items belonged to the victim, she did not conduct any tests to see what type blood it was.

The victim's bra revealed multiple damage. There were scattered torn areas in the bra and tears in both cups. The straps had been detached away from the back straps. Additionally, the clasp had been bent as if the bra had been forcefully removed.

Ms. Williams also examined the three rocks that had been recovered from the scene. All three had Type A blood on them. The smallest rock weighed five pounds, the medium one 12 pounds, and largest 48 pounds, 2 ounces. Additionally, swabs from stains on defendant's car revealed Type A blood on the trunk, hood and hubcap.

An examination of fingernail clippings of defendant revealed blood, but not enough for Ms. Williams to determine what type. Her

examination further revealed Type A blood on defendant's shoe and pants. An examination of defendant's stained underwear revealed Type A on the front and back.

Defendant presented two witnesses, his aunt and his wife. They both testified that when they were at the police station, they saw the defendant briefly when he emerged to get a drink of water. At that time, he appeared to be fine but when they saw him the next day, it looked as though he had been beaten because he had scrapes on his nose. The police denied any brutality.

Defendant was convicted by the jury of murder and attempted rape. This timely appeal followed.

I

Defendant's principal argument on appeal is that the State failed to prove him guilty of attempted rape. In spite of the fact that the jury returned a general verdict of guilty of murder, defendant also urges a reversal of the murder charge because one of the theories of murder was murder predicated on attempted rape.

■ It is incumbent upon the State to prove the defendant guilty beyond a reasonable doubt, even though the evidence presented is circumstantial. (*People v. Williams* (1984), 128 Ill. App. 3d 384, 470 N.E.2d 1140, *appeal denied* (1984), 101 Ill. 2d 587.) Further, "the only requirement [for conviction based on circumstantial evidence] is that the proof of the circumstances be of a conclusive nature and tend to lead, on the whole, to a reasonable and moral certainty that the accused and no one else committed the crime." (*People v. Anton* (1981), 100 Ill. App. 3d 344, 351, 426 N.E.2d 1070.) "Resolution of factual disputes and the assessment of the credibility of the witnesses, is, of course, for the jury [citations], and we will not reverse a judgment of conviction unless the evidence is so unsatisfactory or improbable that a reasonable doubt as to the guilt of defendant remains." *People v. Williams* (1982), 93 Ill. 2d 309, 315, 444 N.E.2d 136.

■ An element of attempted rape is that the defendant intended to have sexual intercourse with the victim. This intent may be inferred from the conduct of the defendant, the character of the assault, the acts done, and the time and place of the occurrence. (*People v. Williams* (1984), 128 Ill. App. 3d 384, 396, 470 N.E.2d 1140, *appeal denied* (1984), 101 Ill. 2d 587.) To commit attempted rape, the perpetrator must intend to accomplish intercourse by force and against the victim's will, and must take a substantial step toward accomplishing his purpose. *People v. Thomas* (1986), 145 Ill. App. 3d 1, 9, 495 N.E.2d 639, *appeal denied* (1986), 113 Ill. 2d 568.

■ In the case at bar, the evidence clearly establishes that the defendant took substantial steps toward accomplishing intercourse by force. It is not necessary to repeat in detail the physical evidence found at the scene, on the defendant's car, on his clothing and his person. The victim's blood was Type A and the defendant's is Type O. These blood types are mutually exclusive. Type A blood was found on defendant's underwear, jeans and shoes. Photographs of defendant's scraped knees were admitted in evidence. The State met its burden of proof beyond a reasonable doubt. It is not required to prove the defendant guilty "beyond the possibility of a doubt." *People v. Perry* (1980), 81 Ill. App. 3d 422, 425, 401 N.E.2d 1263, *cert. denied* (1981), 451 U.S. 983, 68 L. Ed. 2d 839, 101 S. Ct. 2313.

Finally, defendant contends that the victim was dead when he attempted to rape her and therefore it was impossible for him to commit the crime of attempted rape. This argument was not made at trial and was not raised in the post-trial motion. It is raised for the first time on appeal. Whether properly raised or not, the facts do not support defendant's argument.

Indeed, if the victim was dead at the time of the attempted rape there would have been no need to engage in a violent struggle to disrobe and bind her. In addition, the defendant would not have had any reason to check if she was still breathing prior to leaving the scene. Clearly, the evidence demonstrates that the defendant took substantial steps towards accomplishing intercourse by force while the victim was alive and resisting.

To support a conviction based upon circumstantial evidence the facts proved must be inconsistent with any *reasonable* hypothesis of innocence. (*People v. Guest* (1986), 115 Ill. 2d 72, 85, 503 N.E.2d 255, *cert. denied* (1987), ____ U.S. ____, 97 L. Ed. 2d 806, 108 S. Ct. 18.) The record does not support any reasonable hypothesis of innocence.

The evidence supports the conviction for attempted rape. Therefore, it is not necessary for us to address defendant's argument to reverse the murder conviction because it may have been predicated on an erroneous attempted rape conviction.

## II

Defendant challenges his conviction on the grounds that the admission in evidence of his oral statements deprived him of a fair trial and due process of law. He argues that: (1) the statements were given involuntarily and should have been suppressed; and (2) the trial court's determination that the statement was given voluntarily should be accorded no deference but should be reviewed *de novo*.

■ Defendant is not entitled to *de novo* review. The well-established standard of review in Illinois for suppression motions is whether the trial court's finding is contrary to the manifest weight of the evidence. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 120, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) The duty of the appellate court is not to modify rules of law enunciated by our supreme court, but to follow them. *Walton v. Norphlett* (1977), 56 Ill. App. 3d 4, 5, 371 N.E.2d 978.

Defendant's reliance on *Miller v. Fenton* (1985), 474 U.S. 104, 88 L. Ed. 2d 405, 106 S. Ct. 445, for the proposition that he is entitled to *de novo* review is misplaced and premised on a strained interpretation of that case. The issue in *Miller* was whether the voluntariness of a confession is an issue of fact entitled to a presumption of correctness under the Federal *habeas corpus* statute (28 U.S.C. §2254(d) (1982)). *Miller*, 474 U.S. 104, 88 L. Ed. 2d 405, 106 S. Ct. 445.

■ It is well established in Illinois that "[w]hether a statement is voluntarily given depends upon the totality of the circumstances." (*People v. Prim* (1972), 53 Ill. 2d 62, 70, 289 N.E.2d 601, *cert. denied* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731.) Factors that are considered in making such a finding include deception by the police, defendant's age, education and intelligence, duration of the questioning and whether he received his constitutional rights or was subjected to any physical punishment. (*People v. Cortez* (1986), 143 Ill. App. 3d 1024, 1026, 494 N.E.2d 169.) Additionally, in *People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726, the Illinois Supreme Court reiterated that on review the "inquiry is limited to whether that finding is contrary to the manifest weight of the evidence." (87 Ill. 2d at 118.) The court also explained that in ruling on a motion to suppress statements, the weight to be given to the defendant's evidence is for the trial court to decide. 87 Ill. 2d at 118-19.

■ After an extensive suppression hearing, the trial court specifically found that the defendant was properly advised of his constitutional rights; that at the time of the alleged occurrence, he was married and an expectant father; that he was emancipated; that he was not under any mental or physical disability to understand communication; that he was not beaten, coerced or tricked into making any statements; and that he had previous experience with the criminal justice system. We therefore conclude that under the totality of the circumstances, the trial court properly denied defendant's motion to suppress his oral statements.

## III

■ Defendant contends that since this court reversed the trial court's refusal to suppress the statement of his codefendant, Johnny McGhee, it is incumbent upon us to also suppress his oral statements. (*People v. McGhee* (1987), 154 Ill. App. 3d 232, 507 N.E.2d 33, *appeal denied* (1987), 116 Ill. 2d 570.) This argument is misplaced.

In *McGhee*, we reversed the trial court because the defendant was arrested without probable cause in violation of the fourth amendment (U.S. Const., amend. IV), and that "[n]o act occurred between the original arrest and the defendant's confession which purged the taint of the illegal arrest." (*McGhee*, 154 Ill. App. 3d at 240.) Here, defendant Fisher does not dispute the existence of probable cause for his arrest. He was in police custody on an unrelated charge and the police had evidence linking him to the crime under investigation when they had their first contact. He was properly admonished as to his constitutional rights prior to his oral statements.

A comparison of the facts clearly shows that McGhee and defendant Fisher were not similarly situated at the time of arrest. Of critical importance is the difference in defendant's age. McGhee was a juvenile and thus entitled to the protection of the Juvenile Court Act (Ill. Rev. Stat. 1985, ch. 37, par. 701—1 *et seq.*). In *McGhee*, we held that "[a]n incriminating statement by a juvenile is a sensitive concern and the greatest care must be taken to assure that the admission was voluntary." (*McGhee*, 154 Ill. App. 3d at 239.) Defendant Fisher did not come under the protection of the Juvenile Court Act. The trial court found that he was married, an expectant father, emancipated, and no stranger to the criminal justice system.

Another important distinction between defendant and *McGhee* is that the "length of interrogation" and "lack of sleep" that this court found in *McGhee* are not present in regards to defendant. Defendant was first questioned at the 13th District at about 1 p.m. At this time, after a 20-minute interview, defendant denied any participation in the victim's murder. Defendant was not spoken to again until 7 p.m., when he stated that he wanted to "tell the truth" and admitted to hitting the victim with the rock. The record is free from any coercion, threats or lengthy interrogation techniques. Most of the time lapse between 1 p.m. and the subsequent 7 p.m. oral admission was spent not with defendant but with other investigation relative to this case. An assistant State's Attorney was brought into the case late that evening and took an oral statement from defendant Fisher shortly after midnight. Unlike *McGhee*, there was no evidence of defendant being worn down by lack of sleep. In *McGhee*, there was evidence of "no sleep

from 7 a.m. on May 26, until after 5:15 a.m. on May 28." 154 Ill. App. 3d at 236.

Based upon the totality of the circumstances, it is apparent that defendant's reliance on *McGhee* is without merit.

## IV

■ Next, defendant argues that the trial court erred when it denied his motions *in limine*. Defendant wanted the trial court to rule that he could testify with the assurance that the State could not impeach him with his previously suppressed written statement. He argues, without citing any authority, that the court's ruling "chilled his right to testify on his own behalf."

Defendant's argument is unpersuasive. Exclusion of evidence is within the sound discretion of the trial court and its ruling will not be disturbed absent an abuse of discretion. (*People v. Goka* (1983), 119 Ill. App. 3d 1024, 1029-30, 458 N.E.2d 26, *appeal denied* (1985), 102 Ill. 2d 556.) It is axiomatic that when a defendant takes the witness stand, he, like any other witness, places his credibility in issue and is subject to impeachment. (*People v. Young* (1983), 118 Ill. App. 3d 803, 812, 455 N.E.2d 845, *appeal denied* (1984), 96 Ill. 2d 571.) "Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury." (*Harris v. New York* (1971), 401 U.S. 222, 225, 28 L. Ed. 2d 1, 4, 91 S. Ct. 643, 645.) Here, defendant wanted to take the witness stand, deny that he ever made any of the four oral inculpatory statements to law enforcement officers, and be free from being impeached with his written statement. This he could not do.

■ ■ The law is clear. A defendant who makes statements after being advised of his right to remain silent may be impeached at trial by these statements as prior inconsistent statements. (*Anderson v. Charles* (1980), 447 U.S. 404, 408, 65 L. Ed. 2d 222, 226, 100 S. Ct. 2180, 2182.) While illegally obtained evidence may not be used in the State's case in chief, prior inconsistent statements obtained in contravention of the *Miranda* requirements may be used to impeach the truthfulness of a witness. (*Harris v. New York* (1971), 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643.) Thus, the trial court did not abuse its discretion.

## V

■ Finally, defendant alludes to the fact that his constitutional rights may have been violated because of the incompetence of counsel. On the contrary, we find that defendant was ably represented. First,

counsel sought and obtained a separate trial from his codefendant; then he succeeded in suppressing a written confession; he caused the prosecution to voluntarily drop one count; and he succeeded in obtaining a directed verdict on a number of felony counts.

Based on the foregoing, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN, P.J., and SCARIANO, J., concur.