THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EDWARD R. SHIELDS, Defendant-Appellant.

First District (2nd Division)   No. 1—87—1620

Opinion filed March 28, 1989.

Paul P. Biebel, Jr., Public Defender, of Chicago (Barbara McClure and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, Judy L. Groeneveld, and Andrea K. Muchin, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Edward Shields, was found guilty of the murder of Richard Benage by a jury and sentenced to a term of imprisonment for 24 years.

The killing of Benage took place on August 16, 1986, during a traffic altercation at the intersection of Granville and Kenmore in Chicago. At the time of the occurrence the defendant was 51 years old; he was handicapped in that he had lost one leg in 1973 and was using a wooden leg. Because of bone infections and adhesions to the knee in his other leg, he could not bend that knee more than 50 degrees. As a

result his ability to move was restricted.

On the day of the murder, the defendant, who owned his own white Ford cab, was driving around to buy tires. At approximately 2 p.m. on August 16, 1986, Karen Goodiron, a full-time employee of SAS Auto Delivery, picked up a co-employee, Richard Benage, to go with her to Granville and Kenmore to open up a car door because a man had locked his keys in the car. Benage, who was not scheduled to work that day, rode in the passenger seat. He was wearing jeans and a tee-shirt. He was unarmed and did not appear to her to be intoxicated.

At approximately 2:50 p.m., while Goodiron was driving north on Broadway, a white taxi came from Foster and cut her off. She later identified the defendant as the driver. She saw that he was wearing a tee-shirt with no collar. The cab stopped suddenly in the right-hand lane of traffic as did Goodiron. Benage told Goodiron to go around the cab; she pulled out and ended up to the left of the cab. Both the driver's side and passenger windows of both her car and the cab were open. The defendant was alone. During the course of driving down the block, Goodiron beeped her car horn as did the defendant; both the defendant and Benage were swearing and "giving each other the finger."

Both cars stopped at Bryn Mawr for the red light. At that point there were four lanes of traffic going north. Another car, operated by John Yun, was in the left-hand turn lane; Goodiron's car was in the lane immediately to the right; both lanes to the right of her car were empty. The cab pulled about eight feet to the rear of her car. The defendant and Benage gave each other the "finger" again, and Benage began to leave her car to see what the problem was. She attempted to restrain Benage but was unsuccessful. She testified she did not detect the smell of alcohol on his breath nor did he otherwise appear to be intoxicated. (Chemical tests later showed that he had a blood-alcohol level of .239.) Benage did not have anything in his hands when he left the car. He went around the back of her car to the driver's side of the taxi. As Benage approached the cab, Goodiron saw the defendant bend down in the cab. When she looked back after a shot had been fired, she saw the defendant "leaning" away from the driver's window. John Yun, in another car, testified he saw the victim say something and reach through the open window. He also said that a few seconds later a shot was fired. Neither Goodiron nor Yun saw the actual shooting, because at that moment both were checking the traffic signals to see if the stoplight had turned green. The shot directed their attention back to the cab. Both witnesses testified that after the

shot Benage grabbed his chest and he had nothing in his hands.

The defendant then pulled the cab to the right of Goodiron's car, paused and stared at her and then drove east on Bryn Mawr. Benage was still standing, holding his chest, and blood was coming through his fingers. He told Goodiron, "Do you believe this, he shot me." Goodiron did not see anything in his hand or near him.

After Goodiron parked the car, Benage walked across the street to the corner. She went to call for assistance, and when she returned, the police were on the scene. She described the shooter as a white man in his late thirties or early forties with grayish hair. She did not describe his clothing, but she told the police that the man was driving a white cab.

Judith Zydowsky, one of the police officers who responded to the report of the shooting, testified that she and her partner, Detective William Agsted, were heading northbound on the 5600 block of Broadway when a call came in over their radio that a man had been shot at Bryn Mawr and Broadway. They arrived at the scene within moments. She noticed a man, bleeding, wearing a tee-shirt, pants and gym shoes lying on the sidewalk. She searched the area after interviewing witnesses and did not recover any weapon. After learning from Goodiron that the vehicle involved was a white taxi, she sent out a "flash message" on the police radio and toured the area looking for the cab.

Officer James Berg testified that he and his partner received a flash message that a man had been shot and that the offender was a white male driving a white cab eastbound on Catalpa. They received a second message giving the license number "9802 taxi-cab." They received a third message that the cab was a Ford and that the license number was registered to a suburban cab company, The Shield Cab Company. He recalled that he had seen that cab at the Acres Motel on Lincoln Avenue. They went to the motel and saw the cab in the parking lot. After learning from the manager where the cab driver was staying, the officers went to the room, knocked on the door and announced that they were police officers. After no response they obtained a key from the maintenance man and entered the room. The defendant was standing in the middle of the room with his hands up, wearing a white tee-shirt, blue jeans and regular street shoes.

The defendant testified that he had been dressed in a white shirt with a left breast pocket in which he kept a wad of single dollar bills to make change. As he turned on Broadway, he noticed a car in his rear-view mirror which was sounding its horn at him and following closely. The horn-sounding continued for an entire block, and he

feared that the driver, whom he did not know to be a woman, was drunk. He found the horn blasting "irritating." He took his right foot off the gas pedal and allowed the other car to pass him on the right. He said that he did not beep his car horn, and he did not say anything to the persons in the other car. The windows in the other car were closed, and he did not hear the occupant say anything. At Bryn Mawr, the other car stopped for a red light, and the defendant stopped his cab about eight feet behind.

A couple of seconds after he stopped, the passenger in the other car got out and came over to the driver's window. As he approached the cab, the defendant did not see anything in his hand. The man screamed at the defendant, "You are an asshole. I am going to kill you." The man reached through the window and threw a punch at him which he ducked. With his left hand, the other man then grabbed the defendant by the left pocket of his shirt, where the defendant kept the wad of bills. At some point the shirt pocket ripped. The defendant used his left arm to try to pull the other man's arm away, and they struggled for no more than five seconds. Unable to break free, the defendant reached for a cigar box on the seat next to him which contained his gun. When he got his gun, the defendant saw that the other man was pointing a gun at him as well. He "froze or panicked" for an instant and then fired one shot at the other man's shoulder. The other man, stunned, released the defendant and stepped back.

Contrary to the testimony of Yun and Goodiron, the defendant said the other man did not clutch his chest. Instead he kept his arms, including his "gun hand" at his side. In fear for his safety the defendant left the area. He turned right on Bryn Mawr, running the red light. He drove to 6400 North Washtenaw, where he kept another car. He picked up a tire from that car's trunk and left the gun in that car. He stopped to get gas and drove to the Acres Motel, where he lived. He took off the torn shirt, still wearing the tee-shirt underneath. Only minutes after reaching his home, the police arrived and arrested him.

■ The defendant raises a number of assignments of error, and we judge that one of them requires that this case be remanded for a new trial. After this case was tried, the Illinois Supreme Court decided *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, and held that the voluntary manslaughter instruction given by the court was improper and required a new trial. The State concedes that the voluntary manslaughter instruction based on belief of justification given in this case was subject to the same objection as that in *Reddick*, but, the State argues, *Reddick* should be given only prospec-

tive application. The State also concedes that this court has recently held that *Reddick* is to be given retroactive application (*People v. Brooks* (1988), 175 Ill. App. 3d 136, 529 N.E.2d 732), but, the State further argues, *Brooks* was incorrectly decided and we should not follow it. (The supreme court denied the State's petition for leave to appeal in *Brooks* on February 1, 1989.) After reviewing the State's argument, we adhere to the views expressed in *Brooks* and remand this case for a new trial.

■ We will discuss the other assignments of error, because the questions may recur in another trial. The defendant contends that the evidence established, as a matter of law, that he acted in self-defense when he shot Benage or, alternatively, that he was guilty, at most, of voluntary manslaughter based on provocation. We reject both arguments. The evidence raised a question of fact whether the defendant acted in self-defense, and there is no evidence to support a finding that the defendant was provoked to kill Benage.

Our holding that there is no evidence to support such a finding is also an answer to the defendant's next contention that the court should have instructed the jury on manslaughter based on provocation. The instruction was properly denied for the same reason.

■ The defendant also argues that his testimony, if believed, established that Benage committed a burglary, since he attempted to commit an aggravated battery on the defendant in his vehicle on a public way. Therefore, the court erred in refusing to instruct the jury on the elements of burglary and aggravated battery. The defendant's argument is based on the self-defense instruction which provides, in part, that a person may use force likely to cause death or great bodily harm to prevent the commission of a forcible felony. A similar argument was made and rejected in *People v. Hanson* (1985), 138 Ill. App. 3d 530, 485 N.E.2d 1144, and *People v. Chamness* (1984), 129 Ill. App. 3d 871, 473 N.E.2d 476. The court did not err in refusing the instructions on burglary and aggravated battery.

■ The defendant also contends that reversible error was committed when he was barred from introducing evidence that Benage made a statement to the physician who treated him at the hospital that he had consumed a 12-pack of beer and a half pint of whiskey before the shooting. The failure of the court to admit this statement was not reversible error, since the court allowed the chemical results of Benage's blood chemistry to show an alcoholic content of .239 and instructed the jury that any person showing a blood-alcohol level in excess of .10 is presumed to be legally intoxicated. However, on retrial, we believe that the evidence of the statement made to the physi-

cian should be admitted. *People v. Gant* (1974), 58 Ill. 2d 178, 317 N.E.2d 564.

■ The last argument made by the defendant is that the court erred in not suppressing Goodiron's identification. He contends that the lineup was suggestive because of the marked physical differences between him and the other participants. He was the only person in his 50's, while the others were 10 to 20 years younger. He was the only one with gray hair, and he wore faded blue jeans while the others wore dark trousers; he had a crew-neck tee-shirt while the other persons, who were police officers, had vee-neck shirts; and he was the only person with a prison identification number on his hand. All of these differences go to the weight of the identification and not its admissibility. *People v. Johnson* (1982), 104 Ill. App. 3d 572, 432 N.E.2d 1232.

We are puzzled by the advancement of this argument since the defendant admitted that he was the person who shot Benage. Identification was no longer an issue in the case. In any event, we conclude that the identification testimony of Goodiron was properly admitted.

Since the voluntary manslaughter instruction based on belief of justification was improperly given, the judgment of the circuit court is reversed and remanded for a new trial.

Judgment reversed and remanded.

HARTMAN and SCARIANO, JJ., concur.