THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LISA FORBES, Defendant-Appellant.

First District (6th Division)   No. 1—87—1040

Opinion filed October 26, 1990.

852

Randolph N. Stone, Public Defender, of Chicago (Vicki Rogers, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb and David R. Butzen, Assistant State's Attorneys, of counsel), for the People.

JUSTICE EGAN delivered the opinion of the court:

A jury convicted the defendant, Lisa Forbes, of the murder of James Bankston (James); the judge sentenced her to imprisonment for 25 years. The defendant was 20 years old at the time of trial. She began going with James when she was 15 years old. They had a child, Mercedes, who was two years old at the time of James' death. The relationship ended, and the defendant filed a paternity suit against James. She was awarded $5,800; she filed a lien on James' home. On December 15, 1985, she left her home in Milwaukee and went to James' home in Chicago, where he was living with his wife, Yvette. The defendant stabbed James to death with a butcher knife. Her first contention is that she was not proved guilty of murder beyond a reasonable doubt.

Yvette Bankston testified that at the time of the killing she shared an upstairs apartment with James and her two children. James' sister, Cloteina Bankston, lived in the first-floor apartment with her son, Amanuel. The defendant had called earlier in the week and spoke with James while Yvette listened on the extension phone. The defendant told him that she wanted to get married and that she "didn't want the house." James told the defendant that he didn't want to marry her and that he loved someone else. The defendant said that she "hated" James and their baby; that if she couldn't have him no one would; and that she was going to put the baby up for adoption. The defendant also said she was coming to Chicago to visit James.

On the morning of the stabbing, Yvette answered the defendant's telephone call. The defendant asked to talk with James, and Yvette told her that he was not home. The doorbell rang on two occasions, but Yvette and James did not answer it. Amanuel, James' nephew, came

to the apartment and spoke with Yvette. Yvette looked out the window and saw the defendant and her child at the front door. She told her girlfriend, Felicia Nickols, and James that the defendant was at the door. Yvette answered the door and told the defendant that James was not home. The defendant said she would wait on the porch until he returned. Twenty minutes later Yvette let the defendant into the apartment because it was cold outside, and Yvette feared for the baby's welfare. The defendant took her coat off and sat down in the living room; Yvette left the defendant in the living room and went into the kitchen. James came into the kitchen and asked for some tea. Yvette told Amanuel to make some. When Amanuel returned with the tea, Yvette brought it to James, who was sitting in the living room with the defendant. The defendant asked James whether there was "any place that they could talk alone." Yvette returned to the kitchen. Shortly afterward she heard James yell, "Baby, help me. She is trying to kill me." Yvette said that James sounded like he was in "shock and distress." Yvette ran to the living room with Amanuel and Felicia. She saw the defendant withdraw a butcher knife from James' left arm. She said that blood "splattered out like a fountain." She observed a gash in James' chest close to the heart area. The defendant spun around and "lunged" at Amanuel with the knife. She then ran out the front door but got caught between the inner door and the screen door, which was locked. As she turned back to return to the apartment, Yvette slammed the door on her and trapped her inside until the police arrived.

Amanuel Bankston testified that after Yvette gave the tea to James and returned to the kitchen, Amanuel looked down the hallway toward the living room. He saw the defendant putting on her coat. He then heard James yell, "Baby, baby, help me, she is trying to kill me." Amanuel ran to the living room, where he saw the defendant strike James across the chest with the knife and then plunge it into his arm. The defendant stood up, looked at Amanuel and "spun" the knife toward him. Amanuel dodged the knife and ran to the kitchen to call the police. When he returned to the living room, he helped Yvette hold the front door where the defendant was trapped. He said that after the stabbing the defendant appeared "calm, like nothing had happened."

Felicia Nickols testified that she was in the kitchen with Yvette and Amanuel when she also heard James scream, "Baby, baby, help me. She is trying to kill me." Felicia ran to the living room, where she saw James, who was yelling, "She stabbed me, she stabbed me. Why?"

Chicago police officer John McCann testified that on December 15, he spoke with the defendant at the Area 3 police station about 3 p.m.

She had been first taken by the arresting officers to the Eighth District police station. He read the defendant her *Miranda* rights, and the defendant responded that she understood them. He asked if she would be willing to speak to him. They then had a conversation that lasted about 20 minutes. She explained what had happened. The statement the defendant later gave to the assistant State's Attorney was basically the same thing she told McCann. He talked to her for about 20 minutes. At about 5 p.m., Assistant State's Attorney Gregory Girote interviewed the defendant in McCann's presence. The defendant thereafter gave an oral and written statement.

Assistant State's Attorney Girote testified that he read the defendant her *Miranda* warnings and that the defendant said that she understood them. Girote wrote down what she told him. She told Girote that on December 15 she took a bus from Milwaukee to Chicago because she wanted to talk with James about child support for Mercedes. The relationship between James and the defendant had ended about two years before. She went to James' house and rang the bell but got no answer. At this time she was "mad because [James] knew [she] was coming and also [she] knew somebody was home and they would not answer the door and it was cold outside." The defendant walked to a nearby Jewel food store where she bought the butcher knife that she later used to kill James. She sat on the steps with her two-year-old daughter Mercedes until Yvette let her in. She again said that she was "mad at this point because of the runaround [she] was getting." After she entered the house she had a conversation with James while he was sitting on a couch with his feet up on a table. When she got up to leave, James was still sitting on the couch drinking tea. She started to leave, but then "something went click because [she] was so mad"; she reached into her bag, pulled out the knife and started stabbing James. She did not remember how many times she stabbed him. James did not have anything in his hands but a cup of tea.

James died from two stab wounds and five cutting wounds. The stab wounds were to his chest and shoulder, and the cutting wounds were to his left chest, left arm, left hand and left ankle.

The defendant was a high school graduate and was employed as a data processor. She testified that during her relationship with James he provided some financial support for Mercedes and visited her often. In spring of 1984 she filed a paternity suit seeking child support from James. Even after she filed the suit James continued to visit her and Mercedes. In September of 1985 she filed a lien on James' house but she did not tell James that she had filed the lien. He continued to visit her, and he was cordial during the visits. She moved to Milwaukee be-

cause her relation with James had turned hostile. He threatened her on a continuous basis to drop the paternity suit and tried to talk her out of filing a lien, not knowing that she had already done so. On December 11 she called James on the telephone. James told her that he would make her life miserable if she proceeded on the court suit.

On December 15 she took the bus to Chicago with her daughter and arrived at James' house in the morning. Nobody answered the bell. She thought she saw someone looking out the first-floor window and again rang the doorbell but no one answered. She walked to a pay phone and called James. Yvette answered and told her that James was not at home and that she did not know when he would be home. The defendant then went to Jewel food store where she bought a butcher knife and some other things and returned to James' home. She bought the knife because she was "scared" of James. She said that "it was a combination of things, going to the house and seeing somebody peek out of the window and not answer the door."

She again rang the doorbell, and Yvette answered. Yvette told her that James was not at home, and the defendant said she would wait on the porch. Eventually, Yvette opened the door and let her in. She sat and talked with James in the living room of his apartment. They discussed the lien, among other things, and began to argue. She decided to leave. When she asked who Yvette was, James said Yvette was his "old lady." She then made a sarcastic remark about Yvette, and James threw a cup of tea in her face while he was sitting on the couch. As a result her vision became blurred when her soft contact lenses absorbed the fluid. She hit James in the face with the baby's bag. James then called to Yvette to "come get this bitch." She saw people running down the hallway. She then took her knife out of her bag, unwrapped the plastic wrapping and started stabbing James. James had never struck her or pushed her at any time, and she saw nothing in his hand at the time of the stabbing other than the cup of tea.

■■ It is our judgment that the State's case against the defendant was overwhelming. The undisputed evidence discloses that there was a dispute between the defendant and James about support payments for the child; that she left Milwaukee to come to James' home and that she bought a butcher knife. Three witnesses testified that they heard James cry out for help; he said that the defendant was trying to kill him. James was stabbed twice and cut five times, *once in the ankle.* Witnesses saw her withdrawing the knife from James' arm; she had already stabbed him in the chest. One witness actually saw her strike James across the chest and then plunge the knife into his arm. In her statement she admitted that she was mad when she entered the apart-

ment with the butcher knife. She said that "something went click because [she] was so mad," but she had the presence of mind to pick out the knife from her purse, take off the wrapping and then stab him repeatedly. She did not remember how many times she stabbed him. The defendant's own testimony was damaging to her. James had never harmed her before he allegedly threw the tea in her face. She swung the bag she was holding at his face, and he called to Yvette to "come get this bitch." She *thought* he was going to hurt her. She repeated the same sequence of events that she had described to Girote: she took out the knife, took off the wrapping and stabbed James. We conclude, in short, that the defendant's claim that the evidence was insufficient is without merit.

The defendant next contends that the court erred in denying her motion to suppress the statement she made to the assistant State's Attorney. At the hearing on the motion to suppress, Officer James O'Marrah testified that he gave the defendant *Miranda* warnings when he arrested her around 12:15 p.m. She said that she understood. She did not respond when he asked what had happened. He noticed bloodstains on her hand, but he did not see any cuts. The police decided to let Mercedes remain in the custody of relatives of James.

Officer McCann and Assistant State's Attorney Girote also testified on the motion to suppress. McCann questioned the defendant at about 3 p.m. He also advised the defendant of her rights; she said she understood and agreed to answer questions. The questioning session lasted about 20 minutes during which time technicians from the crime detection laboratory took photographs of her and samples of the blood which were still on her hands. He observed scratches on her hands and asked if she wanted medical treatment. She said that it was not necessary at that time. At the conclusion of the questioning and after the crime detection laboratory technicians were finished, the defendant was allowed to wash her hands at about 3:30 p.m. He was present when the defendant was questioned by Assistant State's Attorney Girote at 5:50 p.m. that same day. She made no complaints at any time. She was calm, coherent, never asked for an attorney and did not refuse to talk. After the statement she made to Girote, she was allowed to telephone her mother at about 7 p.m. and was taken to a hospital for medical treatment. She did not receive any food while at the police station.

Assistant State's Attorney Girote first spoke with McCann after arriving at the station and then questioned the defendant in the presence of McCann and his partner. Girote read the defendant her *Miranda* rights; she stated that she understood them and agreed to

talk to him. He questioned her for about 10 minutes and then asked if she would give a written statement. She agreed; he told her to repeat her statement while he wrote it down. After the statement was written down, he read it to her aloud and then told her to read it. She looked at each page and upon his request signed each page. She never asked for an attorney and was alert, coherent and rational during the questioning.

The defendant testified that she did not remember if the police read her rights when she was arrested. She asked if she could take her child but was refused, and she asked for an attorney. At the police station she asked if she could use the bathroom and make a phone call. She was not given any food and her hands were cut and bleeding. She was taken to another police station; she asked the detectives about her child and if she could use the telephone and bathroom. They told her she could not do so at that time. She also told them that she wanted an attorney and that she did not want to make a statement. The detectives left the room for short periods on several occasions and then returned to ask her again to make a statement. She finally agreed to answer questions when she realized that she would only be allowed to use the telephone and bathroom and to find out about her child after she cooperated with them. After talking to the detectives, arrangements were made for her child to be picked up; after signing the statement, she was allowed to call her mother and was taken to a hospital. She said she gave a statement only because the police kept coming into the interviewing room and asking her to do so and because she was worried about her daughter. She said that she told the police the truth; she denied giving the statement that Girote identified.

At the time he denied the motion to suppress, the judge said that the issue was essentially that of credibility of the witnesses and that he was resolving the conflict in testimony in favor of the police officers and the assistant State's Attorney. He specifically found that the defendant was given the *Miranda* warnings during the ride to the police station; that she was allowed to place a telephone call before she gave the statement; and that she was allowed to use the washroom at approximately 3:30 p.m., which was before she gave the statements. The judge concluded that under the totality of the circumstances he found that the statement was freely and voluntarily given and that the defendant knowingly and intelligently waived her right to remain silent and her right to an attorney.

■ The defendant's argument is twofold: first, she maintains that her silence after receiving *Miranda* warnings for the first time amounted to an assertion of her right to remain silent and that that

right should have been "scrupulously honored" as required by *Michigan v. Mosley* (1975), 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321. The answer to this argument is that her mere silence after receiving *Miranda* warnings was not an assertion of her right to remain silent. The applicable principle is derived from *People v. Stack* (1986), 112 Ill. 2d 301, 493 N.E.2d 339: If a defendant does not respond to *Miranda* warnings, the interrogations may continue, although any statement made by the defendant would be inadmissible without proof that the defendant understood the right to remain silent and had waived that right. "[A] defendant can end interrogation only by making an overt response." 112 Ill. 2d at 306.

■ The defendant's second argument is that the totality of the circumstances necessarily leads to the conclusion that the statement was not voluntarily made by the defendant. On this point, she makes the threshold argument that we should ignore the previous pronouncements of the Illinois Supreme Court that the trial court's finding of voluntariness of a statement will not be reversed unless it is against the manifest weight of the evidence. (See *People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) She maintains that the rule of the Illinois Supreme Court is in direct contradiction to Federal law and that we should subject the evidence to a *de novo* review. This precise argument had been made and rejected in *People v. Abernathy* (1989), 189 Ill. App. 3d 292, 545 N.E.2d 201, and *People v. Fisher* (1988), 169 Ill. App. 3d 915, 523 N.E.2d 1119. As an intermediate court of review we are bound to follow the law as enunciated by our supreme court, which has spoken in *People v. Clark* (1986), 114 Ill. 2d 450, 501 N.E.2d 123, and has reaffirmed the rule of *Prim* that the trial court's finding that a statement was voluntary will not be disturbed unless the finding is contrary to the manifest weight of the evidence.

■ We need not repeat the testimony of the witnesses, including the defendant, who testified on the motion to suppress. It is enough to say that we agree with the trial judge that the issue centered on the credibility of the witnesses. The defendant's testimony that she asked for a lawyer, that she was denied the use of the washroom or the telephone and that she was denied medical treatment was contradicted by the testimony of other witnesses. We cannot say that the trial judge was unjustified in relying on the testimony of the State's witnesses. In turn, we cannot say that his decision determining that the statements were made voluntarily was against the manifest weight of the evidence.

■ The defendant next contends that the judge erred in denying her motion to discharge the jury venire because of remarks made by a

prospective juror. During jury selection the entire venire was asked by the judge whether they or any member of their families or friends had ever been the victim of a crime. One of the prospective jurors said that his uncle had been beaten and murdered in 1976 in New Jersey. The individuals involved were convicted and imprisoned but released after two years. He feared that the experience would cause him to be biased and prejudiced. The trial judge asked whether he could put aside the experience and be fair and impartial, and the juror replied, "Not with the sentence that was received." The juror was then dismissed for cause. The defense attorney then made a motion to discharge the venire which the judge denied. The judge thereafter admonished the jury:

> "Ladies and gentlemen, you just heard the last juror mention concerning the murder of his uncle in New Jersey, the sentence, etc. The laws of New Jersey are substantially different than they are in Illinois.
>
> And secondarily, I would remind you that you are not to concern yourselves with the sentencing. Your total responsibility is to determine whether or not the State has proven any or all of these counts or charges, if you will, against the defendant beyond a reasonable doubt.
>
> If you do, it is your responsibility to sign a verdict of guilty. If you find that the State had not proven the defendant guilty beyond a reasonable doubt of any or all of these charges, as to those charges so found, it is your responsibility to sign a verdict of not guilty. Any sentencing, in the event there is a finding of guilty, will be the responsibility of the court pursuant to statute outside your presence in these proceedings.
>
> Would the statements of the last juror affect any of your ability to be fair and impartial? Any one at all? No one."

The defendant does not cite any case in support of her argument. We doubt that one exists that would justify a reversal of conviction on this ground. We believe the judge acted promptly and correctly and exercised his discretion soundly.

The defendant next maintains that the jury was erroneously instructed on the offense of voluntary manslaughter. The State agrees that the jury was erroneously instructed based on the holding of the supreme court in *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141. The State maintains, however, that *Reddick* should be given only prospective application. In *People v. Brooks* (1988), 175 Ill. App. 3d 136, 529 N.E.2d 732, the First District Appellate Court held that *Reddick* is to be applied retrospectively. The supreme court denied the

State's petition for leave to appeal. (*People v. Brooks* (1989), 124 Ill. 2d 557, 535 N.E.2d 916.) Following *Brooks*, other courts have held that *Reddick* was to be applied retrospectively in cases of direct appeal. (*e.g., People v. Shields* (1989), 181 Ill. App. 3d 260, 536 N.E.2d 999; *People v. Fercsi* (1989), 182 Ill. App. 3d 13, 537 N.E.2d 912.) The supreme court subsequently granted the State's petition for leave to appeal in a number of cases, including *Shields* and *Fercsi*, and they have been consolidated. The supreme court recently decided *People v. Flowers* (1990), 138 Ill. 2d 218, and held that *Reddick* is to be applied prospectively in collateral proceedings. The question of its applicability to cases of direct appeal is still to be decided. We have been informed that final briefing in those cases has not been completed. Consequently, at this point, we must adhere to the decisions of this district including *Brooks* and hold that *Reddick* is to be applied retrospectively and that the court erred in instructing the jury on the burden of proof in establishing the elements of voluntary manslaughter.

■■ Other cases decided after *Reddick* have held that the instruction constituted harmless error. (See *People v. Nunn* (1989), 184 Ill. App. 3d 253, 541 N.E.2d 182; *People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531. *Cf. People v. Skipper* (1988), 177 Ill. App. 3d 684, 533 N.E.2d 44 (improper instruction on elements of aggravated battery held to be harmless error in view of the quantum of proof).) In *People v. Fierer* (1988), 124 Ill. 2d 176, 529 N.E.2d 972, the court held that, in order for an alleged error in instructions to be considered harmless, it must be demonstrated that the result of a trial would not have been different if the proper instruction had been given. (124 Ill. 2d at 187.) In our judgment the erroneous instruction constituted harmless error.

We need not repeat our discussion of the evidence in response to the defendant's argument that the evidence was insufficient to convict. We will repeat our observation that the evidence was overwhelming. It has been demonstrated to us that the jury verdict would not have been different if a proper instruction had been given. Indeed, we have serious doubts that the evidence supported the giving of the voluntary manslaughter instructions, which were given over the State's objection. *Cf. People v. Everette* (1990), 141 Ill. 2d 147 (evidence insufficient to support the giving of a self-defense instruction).

Before the defendant testified, the State made an oral motion *in limine* that she be barred from establishing any conversation she had with James unless the defense could "show some exception to hearsay." Colloquy ensued during which the defense did not specify the contents of the conversations it would seek to introduce. The judge

recognized that the defendant should be able to establish her state of mind at the time she stabbed James, but he said that the conversation should be "within scope of the time the incident took place" and he "assume[d] a fair cut-off would be the three-hour conversation several days before this incident." The defendant's attorney objected to the "cut-off" because, he said, "there were threats made against her by the victim at times." He said he wanted to get into conversations that occurred in which the victim made threats against the defendant if he lost the house. After further colloquy the judge said this:

> "At this point all I can suggest is I do not know what her testimony is going to be. We may have to have numerous side bars then because I cannot make a ruling at this point. My reasonable cut-off will be the three-hour conversation and thereafter. If you attempt to introduce anything therein after you have laid your foundation, I will be glad to take a look at it."

■■ ■ The defendant now contends that statements made to her by James were admissible for the purpose of showing her state of mind and that the judge erred in restricting her proof. It is the general rule that a defendant claiming self-defense in response to homicide charges may show specific acts of violence and threats by the deceased. Such evidence is admissible to show the circumstances confronting the defendant, the extent of his apparent danger, and the motive by which he is influenced. (*People v. Hoddenbach* (1983), 116 Ill. App. 3d 57, 452 N.E.2d 32.) *Assuming that the defendant had established self-defense,* exclusion of testimony of threats made by the deceased would be error; and we believe restricting proof of threats, otherwise admissible and not cumulative, to the three-day period before the stabbing would be an abuse of discretion. But we believe no error occurred because the defendant was able to establish proof of all threats she wished to introduce. We, therefore, need not decide whether the defendant presented even slight evidence of self-defense.

During her direct examination her testimony was restricted to a certain degree, but during cross-examination she was asked about the telephone conversation she had with James three days before the stabbing and the threats he made to her at that time. She said that was not the first time he said he would kill her if she touched his house. She also said she was afraid because of the threats he had made in the past. On redirect the following occurred:

> "[DEFENSE ATTORNEY]: [The assistant State's Attorney] asked you about threats that James Bankston made. Did these threats occur after the non-support case was filed?
>
> A. Yes.

Q. These threats would occur when you would see him?

A. Or talk to him on the phone.

Q. What was the nature of these threats?

A. Just that, you know, he wanted me to drop the lawsuit and I wouldn't and to just leave him alone about the money and not to file a lien against the house and that if I didn't that he would make my life miserable, that the house was just about the only thing he had, and if I made him lose it, he would kill me. He would make me regret that I ever met him. Just the same.

Q. *Do you have more to say?*

A. *No.*" (Emphasis added.)

We judge, therefore, that the court's *in limine* ruling in no way prejudiced the defendant.

■■ The defendant next contends that prejudicial error occurred during the State's closing argument. The defendant did not object to the remarks during the trial and the generalized statement in the post-trial motion that the defendant was "denied a fair trial by the State's closing and rebuttal arguments" was insufficient to preserve the remarks for review. (*People v. Camp* (1984), 128 Ill. App. 3d 223, 470 N.E.2d 540.) The defendant has therefore waived the issue. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124.) Even if we were to assume that the question had been properly preserved, we hold that no prejudicial error occurred.

The prosecutor said that if a man was on trial the jury would not condone a man doing the acts that the defendant did and would not hesitate to sign a guilty verdict. That argument should not have been made, but, considering the quantum of the evidence against the defendant, its effect was harmless. At another point, the State's Attorney said the following:

"Well, I suggest to you she got up there and told a story of lies. You can't coach lies. Only the truth comes through. You can't coach lies. It was a mass of contradictions."

The defendant argues that that argument was a suggestion that the defendant's attorney was engaging in trickery or other improper conduct. We have examined the entire argument of the prosecutor and conclude that it was an isolated passage which, when considering the entire argument, is susceptible of a meaning other than that suggested by the defendant. Consequently, we find no error. See *People v. Phillips* (1989), 127 Ill. 2d 499, 538 N.E.2d 500.

■■ The defendant last contends that the victim-impact statements were improperly admitted. The defendant concedes that the recent supreme court decision in *People v. Felella* (1989), 131 Ill. 2d 525,

546 N.E.2d 492, provides that victim-impact testimony is admissible in noncapital cases. The defendant still maintains, however, that the impact statement of James' nephew Amanuel should not have been admitted because the statute restricts the statement to that made by the spouse, parent, child or sibling of a person killed. (Ill. Rev. Stat. 1987, ch. 38, par. 1403(a).) The defendant also maintains that the impact statement of James' wife was improperly admitted because her oral statement had not been prepared in writing in conjunction with the State's Attorney's office before sentencing as required by section 1406. (Ill. Rev. Stat. 1987, ch. 38, par. 1406.) The defendant made no objection to the statements of James' nephew or his wife; consequently, any objection is waived. (*People v. Hood* (1989), 191 Ill. App. 3d 129, 547 N.E.2d 637.) The two cases cited by the defendant are not contrary to *Hood.* In *People v. Scott* (1989), 180 Ill. App. 3d 418, 535 N.E.2d 1113, the court held that the right to argue the question of the constitutionality of the act could be reviewed even in the absence of an objection in the trial court. Constitutionality is not the issue here. In *People v. Fountain* (1989), 179 Ill. App. 3d 986, 534 N.E.2d 1303, the question of waiver was not discussed. Moreover, with respect to the testimony of the wife, the failure to comply with section 1406 is of such a technical nature that any error would be harmless. Similarly, when considering the nature of the offense and the fact that the defendant received a sentence only five years greater than the minimum, we conclude that the judge was not unduly affected by the impact statements of either the wife or the nephew. We note that James' sister recommended a life sentence in her written statement and that the prosecutor asked for an extended term or, alternatively, the "harshest sentence provided by law."

For these reasons, the judgment of the circuit court is affirmed.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.