THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES MACKEY, Defendant-Appellant.

First District (1st Division)   No. 1—87—2143

Opinion filed December 24, 1990.

Randolph N. Stone, Public Defender, of Chicago (Denise R. Avant and Karen E. Tietz, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Marilyn F. Schlesinger, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, James Mackey (defendant) was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1) and armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2) and sentenced to an extended term of 60 years. On appeal, defendant contends that (1) the trial court erred in denying his pretrial motion to quash his warrantless arrest and suppress subsequent statements, (2) the trial court erred in denying his pretrial motion to suppress his involuntary statements, (3) the trial court erred in failing to pose certain questions to the venire, (4) the trial court erred in refusing a jury instruction for voluntary manslaughter based on provocation, (5) the issuance of Illinois Pattern Jury Instructions, Criminal (2d ed. 1980) (hereinafter IPI Criminal 2d) on the offenses of murder and voluntary manslaughter based upon unreasonable belief of justification (IPI Criminal 2d Nos. 7.02, 7.06)

were deficient and require a new trial, and (6) the trial court improperly imposed an extended-term sentence on the armed robbery conviction.

At 11:30 a.m. on December 1, 1985, officers from the Chicago police department were summoned to a Dominick's Finer Food store in Chicago, where James Morgan directed them to the apartment of 36-year-old William Markowski, a CTA bus driver. Inside the apartment, police discovered Markowski lying on the floor in the bathroom, tied to the drain pipe of the sink. A subsequent autopsy of the body revealed the cause of death to be multiple stab wounds to the back, chest and neck. On December 3, 1985, defendant was arrested in connection with the incident.

Prior to defendant's trial, defendant filed a motion to quash his warrantless arrest and suppress the resulting evidence, as well as a motion to suppress his statement on the ground that it was involuntarily given to police. The State offered the testimony of Chicago police officer Wayne Bunch at the hearing on the motion to quash arrest.

At approximately 4 p.m. on December 3, 1985, Officer Bunch received a call from Officers Kater and Bell to assist in a homicide investigation. A vehicle check on a car driven by Robert Wright had indicated that the car had been stolen in the course of a homicide. Upon searching the car, the officers found a license plate registered to the victim. After being advised of his *Miranda* rights, Wright told the officers that he had obtained the automobile from his friend, "Red," also known as James Mackey, who was staying at Wright's mother's house with him at 6338 South Hermitage in Chicago. At approximately 4:15 or 4:20 p.m., Officer Bunch proceeded to this address without a warrant, entered the house, and arrested defendant.

At the hearing on defendant's motion to suppress his statement, the following evidence was adduced: Chicago police detective John Fitzsimmons testified that he and his partner, Detective Lawrence Thezan, assisted Detectives Bittenbinder and Mahone in the homicide investigation on December 3, 1985, after defendant had been transported from the District 7 police station at 6120 South Racine to the Area 6 police station at Western and Belmont Avenues. The four officers interrogated defendant at various times after advising him of his *Miranda* rights. Fitzsimmons questioned Wright and Sharon Sappington separately during this time, although he could not recall the sequence of the conversations. Defendant denied his participation in the offense on at least three occasions, after which Fitzsimmons showed defendant to Wright and Sappington, both of whom were lo-

cated in separate interview rooms on the same floor.

Detective Thezan testified that he spoke with defendant, who was wearing a thick, white paper suit because his clothing had been seized for evidence, for a period between one and two hours when he came on duty at approximately midnight on December 4, 1985. Thezan later stated that he spoke to other people before his conversation with defendant. Between 2 a.m. and 10:39 a.m., Thezan spoke with defendant two or three times and he showed defendant to either Wright or Sappington. Defendant made his statement to Detectives Fitzsimmons and Thezan in the early morning hours of December 4, 1985, and only Officers Thezan, Fitzsimmons, and Mahoney saw defendant from midnight to the time the assistant State's Attorney arrived to take defendant's statement.

The assistant State's Attorney began the court-reported statement at 10:39 a.m., with its conclusion at 10:53 a.m. Fitzsimmons and Thezan denied that any one hit defendant, or threatened to arrest his girl friend and take his children away if he did not make a statement.

Wright, testifying on behalf of defendant, admitted that he was serving a two-year prison term for possession of a stolen auto as a result of the December 3 incident. He testified that after the police stopped the stolen car he was driving, which bore only one license plate instead of the required two, he informed police that he had obtained the car from defendant and that defendant lived with Wright at the home of Wright's mother. The police proceeded to his house and arrested the fully dressed defendant. Both Wright and defendant were brought to the 61st and Racine police station, where they remained several hours until transported to the Western and Belmont police station. There, police took them to separate rooms, "approximately five doors down."

Wright observed defendant on two occasions when he looked out the interview room's door window. Defendant was naked inside his interview room on the first occasion and standing naked outside the interview room on the second occasion. While in the interview room, Wright heard "[n]oises like somebody was getting slapped or hit" from the direction where defendant was located. Wright did not repeat these observations before the grand jury later that day.

Sappington, testifying on behalf of defendant, stated that she lived with defendant on December 3, and they had three children. Two policemen entered the house and stated that they had a warrant for defendant's arrest. She followed defendant to the 61st and Racine police station at 2 p.m., but returned home. Police returned to her residence at 11:45 p.m. and brought her to the Western and Belmont

police station, where they informed her that she was under arrest for withholding evidence.

During the six conversations she had with police officers while in a second-floor interview room, police advised her that they would become violent and take her children away if she did not cooperate. Sappington "told the police what they wanted [her] to say." Around 9 a.m., Sappington observed defendant wearing a white suit and with a swollen face.

Defendant and the State stipulated that Dr. Scott Cooper of Cermak Health Services would testify that on December 13, 1985, he examined defendant and found "[f]lat-hand trauma to both ears, one week ago *** accompanied with loss of hearing to the left ear. Tympanic membranes dull, injected, slight blood left lower central with possible healed perforation." Dr. Cooper's report made on December 13, 1985, states "hit by Chicago Police, trauma, and now accompanied with loss of hearing." An audiogram ordered on January 6, 1986, indicates that defendant at "one thousand hertz" could hear at 0 to 10 decibels in the right ear, but could hear in the left ear only at 50 to 60 decibels.

The parties further stipulated that the initial intake report made to Cermak Health Services on December 5, 1985, shows negative indications, except for ear, nose and throat trouble. The report notes no bruises on defendant's body, the only identifying mark of any kind being a tattoo on his right wrist. The report indicates that defendant stated he "received ear injury by CFD [sic]."

The trial court denied both of defendant's motions, and the following evidence was thereafter adduced at defendant's trial before a jury.

James Morgan testified that he knew the victim for approximately two weeks on December 1, 1985, and that he had had a sexual relationship with the victim. While Morgan testified this relationship included having the victim perform fellatio on him and excluded anal intercourse, Chicago police detective Jerry Mahon stated that Morgan had told him that they had previously engaged in oral sex and anal sex. Morgan admitted that he had previously told an investigator that he at some time had refused the victim's request to have anal intercourse with him, but denied that the victim had asked Morgan to tie the victim up and have anal intercourse with him.

On December 1, shortly after 2 a.m., Morgan peered through the closed blinds on the front window of the victim's ground-level apartment at 528 West Wellington. He noticed a ransacked apartment and someone in blue jeans holding a silver object. The person holding the

object turned off the light. Morgan heard a "colored man's" voice say, "Shut up. There is somebody coming" and the victim say, "Help, help."

Morgan proceeded to the back window and attempted to look in, but observed only a light coming from the bathroom. He heard the victim yell "[H]elp, police, help" and heard "[a] lot of ransacking going on." Morgan ran to Dominick's on Broadway and telephoned the police.

When the police arrived, Morgan directed them to the victim's apartment and waited inside the police car. Upon receiving no response at the door, the police returned to the car laughing. Morgan showed the officers the window he had looked through earlier on the side of the building. He then noticed that the screen on the window was broken. Morgan ran and did not see the police officers again.

Morgan slept in the basement of the apartment building. The next morning, he noticed the absence of the victim's red Mustang, which had been parked in the apartment lot the previous evening. Morgan climbed through the back window and into the apartment. He observed the victim bleeding and tied to the bathroom sink. Morgan ran out the locked front door and requested assistance next door.

Chicago police officers were summoned. Morgan met the officers at Dominick's and directed them to the crime scene. After police processed the scene, Morgan accompanied them to the police station.

Moran admitted that he had been convicted of felony theft on December 3, 1984, as a result of taking his father's car, for which he received two years' probation.

Dennis Keating, a mobile unit technician with the Chicago police department, testified that he arrived at 528 West Wellington at approximately 12:30 p.m. on December 1, 1985. Inside the apartment, he observed the front room in disarray. A coffee table and a desk were turned over and a phone jack was off the wall. A small pool of dried blood was underneath the table, and papers were on the floor. A button with attached threads was lying on the front room floor and another button was lying in the hall close to the kitchen. Papers with blood on them were in the hallway leading to the bathroom. In the victim's bedroom, boxes were strewn about and desk drawers opened.

In the bathroom, large amounts of blood were found underneath the sink, on the tub and splattered on the wall. The victim's hands were tied with ligatures, his right hand tied to the goose neck of the drain with a sleeve of a black shirt, a blue cloth scarf and a belt that went underneath his left arm and around the right side of his neck. His left hand was tied to the forearm of his right arm. Defense

wounds, those typical of defense against a knife attack, were on his left arm, right hand, and right arm. Multiple stab wounds were located on the victim's chest and left and center back area. The victim also had a cut on his throat and some "blackness of his eyes."

Stanley Macaldo, a latent fingerprint examiner with the Chicago police department, testified that the Chicago police department requires 8 to 12 points of comparison on a latent fingerprint and an inked impression for an identification. He found 12 points of comparison from defendant's inked fingerprint and the latent print on a green beer bottle taken from the victim's kitchen garbage can.

Detective Mahon testified that he was working the 8:30 a.m. to 5 p.m. shift on December 1, 1985, and processed to the crime scene at 12:15 p.m. with his partner, John Bittenbinder. They recovered a bloodstained T-shirt, a pair of jogging pants, and a pair of CTA uniform trousers. That evening, Mahon checked the radio dispatch cards and discovered that Officers Heinze and Sweeney had been summoned by a citizen to the area of North Broadway and Wellington Streets to see a man who had reported observing a man with a gun.

The deputy medical examiner who conducted the autopsy on the victim, Dr. Mitra Kellakar, testified that her external examination revealed a bruised left side of the face, an abrasion or a bruise on the right frontal area, swelling around the eyes, hemorrhages on the lips and in the conjunctiva and white of the eyes, a fractured nose, and minimal abrasion on the right side of the cheek. The victim had numerous slash marks and incised wounds on the neck, a stab wound to the left side of the neck which extended into the thyroid gland, and a stab wound on the right side of the neck which penetrated deep into the muscles of the neck. A stab wound on the left side of the chest perforated the victim's left lung. A cluster of stab wounds was located on the left lower back, some of which penetrated the left kidney, the liver, and the left lung. A wound on the right lower back penetrated the right kidney. On the back of the right hand were linear incised wounds. Grooves and abrasions were located on the wrist, and an incised wound was found on the palm of the left hand. Altogether, the victim suffered 14 stab wounds and at least 11 slash marks.

The internal examination revealed hemorrhaging in the neck, corresponding to the stab wounds, blood in the chest cavity from perforation to both lungs, blood in the abdominal cavity from the liver and kidney injuries, and blood under the surface of the skull, corresponding to the external bruises.

The medical examiner found post mortem lividity and rigor mortis, both of which set in 8 to 18 hours after death. In her opinion, the

cause of death was multiple stab wounds inflicted when the victim was alive. The victim could not have lived more than a few minutes after suffering the injuries.

On cross-examination, the medical examiner described the victim as a well-developed and well-nourished man. She stated that it was possible that the cluster of wounds to the lower back was consistent with the actions of a person simultaneously stabbing as he was being grabbed into a bear hug, but it was not probable since the actions were difficult to perform. Not all the wounds were fatal, and it is possible that the nonfatal wounds were inflicted first. The wounds were inflicted within minutes of each other.

Robert Wright, testifying on the State's behalf, stated that defendant was living with the Wright family—Wright, his parents, and his two sisters—in the basement portion of their house with Sharon Sappington, his girl friend. Wright admitted that he had been convicted of possession of a stolen motor vehicle as a result of the December 3 incident and received probation. At the time of his testimony, he was on parole on a different case.

While at their home on November 30, 1985, at approximately 8:30 or 9 p.m., Wright had a conversation with defendant and his friend Malcolm. Defendant stated "[t]hat they was going to make a robbery from some homosexuals." Wright refused their invitation to join them. Defendant and Malcolm left the house at 9:30 or 10 p.m.

At approximately 5 a.m. on December 1, 1985, Wright was awakened by defendant knocking on the front door of his home. When Wright turned on the light by the door, he noticed that defendant had three or four "serious scratches" on his face and that defendant was wearing oversized blue jeans, a blue shirt and a jacket—clothing different from that worn by defendant the previous evening. Wright later told police that the clothing defendant was wearing at his arrest on December 3, 1985, was the same clothing he was wearing on December 1, 1985. Defendant told Wright that he had robbed a homosexual and taken $10 and some other items.

Wright then went to the store on defendant's request. Upon leaving the house, Wright noticed a 1983 burgundy and white Mustang. When Wright returned to the house, defendant gave him the keys to the car, explaining that he acquired the car from the homosexual he had robbed. Wright proceeded to the store and returned home with the car.

Wright, defendant and Sappington then had a conversation, during which defendant related the following: The homosexual had picked up defendant on a regular street block and taken him to his home

There, they had an argument and a knife "just appeared." They struggled. "The guy was supposed to be working up on him while [defendant] was swinging the knife." While defendant was swinging the knife, the victim kept walking into it. The victim then grabbed defendant. Defendant managed to free his arms and finished cutting him or stabbing him. When defendant cut the victim's throat, the victim fell to the floor.

Defendant told Wright that, a few seconds later, he heard a knock on the door. He jumped out a window and into a bush. When the person departed, defendant again entered the house through the window. Defendant dragged the victim into the bathroom and tied him up. Defendant took a bath to remove the blood from his body. He grabbed the victim's car keys, $10, a silver ring, and a few other items. At this time, the victim was breathing very slowly. Defendant then returned home in the victim's car.

Wright admitted that, in his testimony before the grand jury the day after his arrest, he stated that defendant told him that defendant had grabbed the victim by the neck when the victim went to step in the door of his house and that defendant had pushed him to the living room floor. As he pushed him, the victim pulled out a knife in an attempt to defend himself, after which defendant took the knife and stabbed him. Wright stated he was telling the truth at both the grand jury proceedings and that day at trial.

Wright further testified that, on December 3, 1985, he was driving the red Mustang in the area of 63rd and Wolcott Streets in Chicago with three other males when the police stopped him and requested his driver's license. Wright had discarded the original plates from the car in an alley close to his house. Wright admitted that he first untruthfully told police that the car belonged to an uncle. After the police told Wright that the car "had a murder on it," Wright denied any involvement in the murder and stated that he acquired the car from defendant. The police took Wright to Wright's house and thereafter to the police station. Wright was arrested before defendant.

Chicago police detective Ernest Bell testified that on December 3, 1985, at approximately 4 p.m., he observed a 1983 Ford Mustang, a white top convertible over red, parked next to Lindbloom High School with only one license plate instead of the required two. Bell ran the plate through the communications section and discovered the plate belonged to a different vehicle, and then ran the vehicle identification number through the communications section, which reported the vehicle registered to the victim and notified him to hold the vehicle and

seize the occupants. Bell searched the vehicle and recovered another license plate. Wright told Bell that he acquired the car from "Red," who was staying at his house with him.

Bell proceeded with other officers and Wright to Wright's home at 6338 South Hermitage at approximately 4:20 p.m. Wright and Bell remained in the vehicle. Chicago police officers Burn and Meier knocked on the front door and were admitted by a female. Bell observed the officers return to the squadcar with a black male. Wright identified the man as "Red," later determined to be defendant.

Bell transported Wright and defendant to the 7th District police station, arriving around 4:30 p.m. After speaking with Wright at that location, Wright showed Bell the location of the original plates to the car and they recovered one plate in a rear, open yard. Bell escorted Wright, defendant and two other people to the Belmont and Western police station at approximately 6 or 7 p.m.

Wright testified that he observed defendant several times at the Belmont and Western police station. The two occupied different rooms across the hall from each other. Wright observed defendant naked for a period between two or three hours during his 10-hour stay. Wright heard periodic yelling and crying for help and slapping noises emanating from the direction of defendant's interview room. The door of his interview room was closed when he heard the noises, and he could not remember the position of the door to the room defendant occupied.

Detective Mahon testified that he was present at the Area 6 police station at 7 p.m. when Wright, defendant and two other individuals came into the station. Mahon interviewed defendant at approximately 8:30 p.m. After advising defendant of his *Miranda* rights, Mahon, along with Detective Bittenbinder, informed defendant that they had reason to suspect his involvement in the robbery and homicide of the victim. Defendant denied any involvement in the murder duing their 30-minute interview. He stated that, at 9 p.m. on November 30, 1985, he left his residence with a friend, named Malcolm, and stayed at the Player's Lounge until 2 a.m. and in the area of the lounge until 3 a.m. Defendant then returned home.

Mahon interviewed Wright between 9:45 and 10:15 p.m. for approximately 30 minutes. In order to inventory defendant's clothing according to police procedures, Mahon returned to defendant's room and had him remove all of his clothing until he put on a paper suit a short time later. Mahon noticed no signs of injury to defendant's body, except a small scratch on his right cheek near the eyeline. Mahon was then informed to wait until the midnight crew arrived for further assistance.

At approximately 1 a.m., Detective Philip Mannion brought Sappington to the police station, after which time Mahon and Thezan, until 2 a.m., interviewed Sappington for 15 minutes, then interviewed Wright for 15 to 30 minutes, then reinterviewed Sappington for 15 minutes. Mahon and Thezan subsequently spoke with defendant after readvising him of his *Miranda* rights.

Defendant denied any participation in the crime. The officers informed him that they had obtained evidence that put him at the crime scene and put him in control of the vehicle subsequent to the victim's death. Defendant again denied involvement, and the officers informed him of the statements he had made to Wright and Sappington. The officers showed defendant the rooms where Sappington and Wright were located. Defendant then related the following during a 45-minute conversation which concluded around 3 a.m.

On that Friday night, Malcolm came over to his house and told him he wanted to rob some "faggots." The two rode the "el" to the North side. As defendant was walking along the street, the victim, who was driving a Mustang convertible, pulled up and asked defendant if he would like to earn $20. Defendant asked what he had to do, to which the victim replied that he would tell him when they arrived at his place. They drove on the Outer Drive for 15 minutes until they reached a location on the North side.

When they entered the victim's apartment, the victim turned on the light and the television. Defendant sat on the couch and began to watch television. The victim offered him a drink, but defendant pushed it away. The victim disappeared into the rear of the apartment and returned, wearing only white, long underwear.

The victim told defendant he was going to "fuck him in the ass." Defendant refused and they began to struggle. The fight continued towards a hallway in the apartment, where the victim grabbed a knife. Defendant wrestled the knife from the victim and stabbed him once in the chest or throat area. The victim continued to fight, and it progressed into the bathroom area. Defendant stabbed him again and punched him, knocking him out.

Defendant then removed his bloody shirt and noticed that some of the buttons had come off. Defendant tied the victim up to the drain in the bathroom and then washed up. During this process, he heard a knock at the door. Defendant turned the lights off in the apartment, then proceeded to the victim's bedroom and changed his clothes. Defendant looked around the apartment and took a $10 bill and a silver-colored ring. He left the apartment through the rear window in the bedroom.

Defendant hid in the bushes, walked around the block, and then came back and took the victim's car. He drove the car to his South side residence and parked it in an alley nearby. Inside, he had a conversation with Wright, during the course of which Sappington joined them. Defendant related his actions on the North side. Afterwards, defendant and Wright purchased food at a store and returned to the residence. The next day, defendant offered Wright the use of the Mustang.

Mahon testified that at the conclusion of his conversation with defendant, he asked Wright, defendant, and Sappington separately whether they wanted anything to eat, and he took them to the washroom and water fountain. Thezan left the station to find Malcolm. Mahon attempted to obtain the services of an assistant State's Attorney, but they were busy on unrelated cases. He contacted the State's Attorney's office around 6:15 a.m. Mahon was not present when the assistant State's Attorney interviewed defendant. No one struck or threatened defendant in Mahon's presence, and only the assistant State's Attorney interviewed defendant outside his presence, although Mahon admitted that, even though he had a view of defendant's room, he was not with him inside the room at all times.

Detective Thezan testified that at 3 a.m. on December 4, 1985, he was instructed to drive to 69th and Ashland in Chicago to look for Malcolm. He was present at the police station at 7:30 a.m. when the assistant State's Attorney interviewed defendant. Thezan witnessed the court-reported statement at 10:15 a.m., and he witnessed defendant read, initial corrections, and sign the transcribed statement. Thezan and the assistant State's Attorney also initialed the pages and signed the last page.

Thezan published and read to the jury defendant's statement made in question-and-answer form. The statement was substantially similar to that testified to by Detective Mahon, with the following additions. Defendant stated that the victim was not wearing a shirt at the time of the struggle. During the struggle, the victim acquired the knife from a cabinet or table, and defendant stabbed the victim three or four times or possibly more times. Defendant used his own black shirt and a towel to tie up the man. The clothes he took from the apartment consisted of a blue T-shirt and a pair of blue jeans. He threw away the brown and silver folding knife somewhere on the North side. He sold the ring he took from the victim for reefer and money and used the $10 for food. Defendant stated that he had no complaints about police treatment and that the police had not threatened him.

On cross-examination, Thezan admitted that he testified at the earlier suppression hearing that he spoke with defendant at midnight and between one and two hours after coming on duty on December 4, 1985, but explained that his later testimony at the hearing clarified that he interviewed other people before he spoke to defendant. Thezan stated at trial that the first time he spoke with defendant was at 2 a.m., and the conversation lasted approximately one hour. Thezan saw defendant possibly two or three other times from 3 a.m. to the time of the court-reported statement. Thezan admitted that a civil judgment was issued against him in an unrelated case for using excessive force during an arrest, but he was never reprimanded by the Chicago police department.

Following the close of the State's case in chief, defendant presented the following evidence.

Macy Antoine, an investigator for the public defender's office, testified that on December 24, 1986, Morgan stated in an interview that he had not had sex with the victim, but that the victim had requested to perform fellatio on Morgan and tie Morgan up and have anal intercourse with him. Antoine's notes of the interview indicated "wanted him to tie him up, then fuck him." Antoine acknowledged that at all other places in his notes, Morgan was referred to in the first person and the victim was referred to as "he" or "him."

Dr. Scott Cooper, the doctor at Cermak Hospital responsible for the treatment of inmates at the Cook County jail on December 13, 1985, testified that defendant told him during an interview that a Chicago police officer had hit him in the ear with the palm of his hand. On conducting an internal examination of defendant's eardrum, Scott noted a small spot of blood in an area of defendant's left eardrum, which may have been secondary to perforation of the eardrum which had not fully healed. Scott could not determine when or how defendant received the injury.

Defendant testified as follows: On December 1, 1985, between 11:30 p.m. and 12 a.m., Malcolm asked defendant to take a ride on the "el" with him to his cousin's house on the North side to borrow some money. Malcolm would then loan defendant $20. After exiting the "el," they began walking south of downtown. Malcolm stopped to speak with a young lady and defendant continued walking to the corner. The victim—a short, white man wearing a bus driver uniform—pulled up to defendant in a red and white convertible top car. The victim asked defendant if he wanted to earn $20. Defendant inquired into the actions which were required. The victim told him he would find out when they arrived at his house. Defendant "figured the guy

wanted to have sex for money." Defendant admitted that he was not "gay" and did not have sex with men, but that he entered a vehicle with a man he thought wanted to have sex with him. He stated he would have allowed the victim to perform fellatio for $20.

They drove the 15-minute drive to the victim's apartment building. On entering the apartment, the victim locked the door from the inside of the apartment and turned the television on and the lights off. Defendant watched television for five minutes, and the victim handed defendant a bottle of beer and offered him a drink. Defendant picked up the bottle but refused to drink. After conferring for 5 or 10 minutes, the victim disappeared into the back and returned wearing only long underwear. Defendant asked the victim what actions were required to earn the money. The victim responded that he would perform fellatio on defendant and "fuck [him] in the ass." Defendant replied that "[he] didn't do that type of stuff" and grabbed his jacket to leave.

The victim grabbed defendant, and they began to wrestle in the front room for 10 to 15 minutes. Defendant was attempting to escape, but couldn't open the door because it was locked. As they wrestled near the desk, defendant was unaware of a knife on the desk. The victim then had something in his hand and he heard a click. They fought over the knife. It fell into the pit of defendant's arm. Defendant pushed the victim off and took the knife.

Defendant asked if he could leave, but the victim told him "no." The victim "came at" defendant, and defendant swung the knife at him, three to four times. Defendant struck him in his throat. The victim "backed off" but came at defendant again. Defendant extended his arm and "just stuck the knife at him," striking the victim in the neck. The victim jumped off defendant. Defendant told him that further actions were unnecessary and requested that the victim permit him to leave the apartment. The victim said "no" and came at defendant again. Defendant stuck the victim once in the chest. The victim backed off, but came at him again. Defendant pointed the knife while the victim attempted to grab defendant. Defendant swung the knife at his arms to avoid being grabbed. The victim then "came in fast," and defendant lost the knife as they struggled. They wrestled into the hallway and stumbled into the bathroom.

Defendant threw the victim off him, but the victim tried to come at him. Defendant jabbed the victim a few times in the face with his fist. The victim hit and scratched defendant on his face. The victim then "fell out." Defendant tied the victim to the drain pipe with a shirt when he began to regain consciousness, but he did not put a

leather belt ligature around the victim's neck or tie the victim with a blue scarf. Defendant never stabbed the victim in the back.

After the victim was knocked unconscious, defendant heard the victim snoring. Defendant also heard a knock on the door, but the persons left. Defendant did not intend to kill the victim or rob him, but was defending himself. Defendant did not suffer any injuries except a scratch on his face.

Defendant prepared to leave and washed the blood off himself. He then put on a pair of pants and a shirt that he found in the bedroom closet. He did not steal $10 or a ring from the apartment. Defendant looked for the keys to exit the locked apartment. After 10 to 15 minutes, he found the keys on the refrigerator and he left the apartment through the front door.

Defendant walked to a bus stop, but returned to the apartment building when he noticed that the bus did not run past midnight and noticed he had the victim's car keys. He took the victim's car and drove to his home on the South side.

When defendant arrived home, Wright answered the door. Sappington was also present. He spoke only to Sappington at that time. After speaking with her for three to four minutes and using the bathroom, defendant requested that Wright obtain some food. Defendant did not offer him car keys. Defendant fell asleep around 3 a.m. to 4 a.m.

At approximately 4:20 p.m. on December 3, 1985, defendant was in the bathroom with Sappington when someone knocked on the door. When defendant opened the door, a white guy put a gun in his face and asked him his name. After defendant responded, he placed him under arrest. The police took defendant to the 61st and Racine police station, where he remained for two to three hours. At 7 or 8 p.m., the police took defendant to the Belmont and Western police station. Defendant was handcuffed in a small room on the second floor.

After an hour had elapsed, two police officers questioned defendant for 5 or 10 minutes. They escorted defendant to another room still handcuffed 15 or 20 minutes later. At some point, two police officers questioned defendant for 10 minutes. Defendant denied knowledge of the incident. The officers returned and stated that Wright had told them everything. Defendant again denied any knowledge of the incident and stated that Wright had lied. Defendant was left alone for 20 to 30 minutes until two officers, not present in court, entered the room. Defendant told them he was with Malcolm at "The Players" bar that night at 69th and Ashland and that he returned home around 3 a.m. After this 30 to 40 minute conversation, the officers departed.

Officer Thezan and another officer returned. They told defendant that they had Sappington at the police station and that she told them everything. Sappington was three to four months pregnant at the time. Defendant denied knowledge of the murder. Thezan punched him in the ribs and hit his ears with the palm of his hand seven or eight times. They left, returned, and took defendant's clothes. Defendant remained naked for one hour. While defendant was naked, Thezan hit him in his ribs and stomped on his toes. Thezan left. When he returned, Thezan stated that if defendant did not tell him what happened, he would incarcerate Sappington, take his children, and beat him.

Defendant told them what happened, but the officers said he was lying. They conversed for over an hour. Defendant saw Sappington and Wright only after giving his statement. Around 4 a.m. or 5 a.m., the officers told defendant that somebody would take his statement. The officer told him what to say—that defendant took some money and left out through the window. If defendant did not so state, they would beat him and incarcerate Sappington.

The officers brought defendant a white paper suit shortly before the assistant State's Attorney arrived. When the assistant State's Attorney and the court reporter arrived, defendant gave a statement. He stated that the police did not threaten him because the police demanded his silence. He signed the statement, but it was not true.

Defendant testified that he had been convicted of burglary in 1981 when he was 15 years old.

In rebuttal, Detective Thezan testified that he never observed defendant without his clothes at the station and that defendant was not naked for two or three hours. He never struck defendant at Area 6 on December 3, 1985, nor did he see anyone else strike defendant.

Detective Mahon testified that he searched the victim's apartment for a knife, but did not find one. He examined the locks to the victim's front door. The bottom lock was equipped with a twist knob to unlock the door from the inside and required a key to unlock it only from the outside of the apartment. The two single-cylinder dead bolt locks on the door open with a knob from the inside and a key from the outside. At the Area 6 police station on December 3, 1985, defendant was naked only for 15 to 25 seconds when he changed from his clothes to a suit.

Following rebuttal, the State and defense stipulated that defendant had a prior conviction for burglary under the name "Alan Butler." They also stipulated that Kay Bailey, an employee of the Cook County Department of Corrections, would testify that her December

5, 1985, report regarding defendant's physical examination on admittance indicates "no signs of violence, bruises or marks" on defendant's body.

On appeal, defendant initially contends that the trial court erred in refusing to suppress his oral and court-reported statements because they were the fruits of an illegal arrest. Defendant maintains that police violated the fourth amendment prohibition against making a warrantless arrest without probable cause and the fourth amendment prohibition, in the absence of exigent circumstances, against the nonconsensual, warrantless·entry into a person's home to effectuate an arrest. See *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.

■ We note that after appellate briefs were filed in this case, the United States Supreme Court, in *New York v. Harris* (1990), 495 U.S. 14, 109 L. Ed. 2d 13, 110 S. Ct. 1640, held that the exclusionary rule does not bar the State's use of a statement made by the defendant outside of his home where police have probable cause to arrest a suspect, even though the statement is taken after a nonconsensual, warrantless entry into a home without exigent circumstances in violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. The Court reasoned that the warrant requirement for an arrest in the home is imposed to protect the home. It does not render unlawful the continued *custody* of a suspect arrested on probable cause once he is removed from the house, thereby requiring the suppression of statements the product of the unlawful custody. *Harris*, 495 U.S. at 20, 109 L. Ed. 2d at 21-22, 110 S. Ct. at 1644.

■ In the case at bar, even assuming *arguendo* a fourth amendment violation of the prohibition against entry into the home without a warrant, the trial court was not required to suppress defendant's statements made at the police station on this basis if the police had probable cause to arrest defendant. Thus, our inquiry here is confined to determining whether police lacked probable cause to arrest defendant and, if so, whether the statements were the product of the illegal arrest.

■ To meet its burden of establishing probable cause for an arrest, the State must show that the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution into believing that an offense has been committed and that the arrestee has committed the offense. (*People v. Robinson* (1976), 62 Ill. 2d 273, 342 N.E.2d 356.) The probable cause determination is a commonsense, practical question to be determined by the totality of the circumstances. (*Illinois v. Gates* (1983), 462 U.S. 213, 76

L. Ed. 2d 527, 103 S. Ct. 2317; *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998.) When examining the probable cause ruling on review, a reviewing court will not disturb the trial court's finding unless manifestly erroneous (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280), and it may consider any evidence adduced during trial which assists in establishing the legality of the arrest (*People v. Caballero* (1983), 102 Ill. 2d 23, 464 N.E.2d 223; *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 463 N.E.2d 864).

The police in the instant case learned that the license plate on the automobile Wright was driving belonged to a different automobile. Wright initially told police that he had obtained the automobile from an uncle. Police discovered that the vehicle had been stolen during a murder two days earlier. After they placed Wright under arrest and advised him of his *Miranda* rights, Wright named defendant as the person from whom he acquired the automobile. Wright indicated that defendant was living with him at Wright's home and the location of his home.

Defendant argues that the information provided by Wright was insufficient to provide probable cause because his statements were unreliable. Defendant asserts that Wright could have been deflecting suspicion from himself since he was driving the automobile and that any presumption of reliability given to an ordinary citizen is negated by the contradictory statements offered by Wright to police.

In *People v. James* (1987), 118 Ill. 2d 214, 514 N.E.2d 998, our supreme court addressed the situation of a murder arrestee's statements as a basis for probable cause to arrest a co-offender. The court rejected the notion that uncorroborated statements by an arrestee can never constitute probable cause for the arrest of a co-offender, and noted that the totality of the circumstances approach permits a balanced assessment of the relative weights of all the various indicia of reliability attendant upon the giving of the probable cause information. *James*, 118 Ill. 2d at 222-23, 514 N.E.2d at 1002.

The circumstances attendant in *James* are somewhat different from those before us, but the court's analysis offers us guidance. No independent verification existed in *James* that the co-offender was involved in the criminal conduct, although the court found that the verification of the arrestee's statements of criminal conduct by facts learned through police investigation lent credence to the unverified portion. The court also found that the arrestee's inculpatory admissions provided an indicia of reliability. It found further enhancement of reliability in the fact that the statements incriminating the co-offender were made without any inducement and that the statements

did not absolve the arrestee of criminal responsibility since he knew he would still be held on the murder charge. *James*, 118 Ill. 2d at 224-25, 514 N.E.2d at 1002-03.

In the latter regard, the supreme court reasoned that since the arrestee realized that he would remain in custody whether he talked or not, the arrestee "had nothing to gain by providing false information for, once the falsehood was discovered, he would have to suffer the consequences of misleading the police." (*James*, 118 Ill. 2d at 224, 514 N.E.2d at 1002.) The court acknowledged that the testimony of an accomplice at trial has been said to be suspect because of the motivation to shift blame to others (see *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620), but noted that the danger of fabrication is less in a probable cause setting. *James*, 118 Ill. 2d at 224, 514 N.E.2d at 1003.

■ In assessing the weight of all the indicia of reliability attendant on Wright's statement in the case at bar under the totality of circumstances, we find Wright's statement to be sufficient to establish probable cause. Police had information that Wright was in possession of an automobile stolen in a murder a few days earlier. Police had already placed Wright under arrest at the time of his statement and had not offered Wright any inducement for his statement. Wright knew that the police had evidence to connect him to the murder since he was in possession of the automobile stolen during the murder. The fact that Wright would have nothing to gain by providing false information lends credence to his statement.

His reliability was enhanced by the fact that he gave specific information regarding the person he implicated, including where the person could be located. It was further enhanced by the fact that this person shared a residence with Wright. It is less likely that Wright would falsely implicate a person with whom he shared a residence, and, because of their relationship, this person had opportunity to give the stolen vehicle to Wright. Thus, we cannot say that the trial court's probable cause determination is manifestly erroneous.

■ Defendant next contends that the trial court erred in refusing to suppress his statements involuntarily obtained by police by use of physical and mental coercion in violation of his fifth and fourteenth amendment rights. The State bears the burden of establishing by a preponderance of the evidence that the confessions were voluntary. (*Caballero*, 102 Ill. 2d at 33, 464 N.E.2d 223.) In determining whether a confession has been voluntarily given, courts have utilized the tests of whether, considering the totality of the circumstances, the confession is found to have been made freely and voluntarily and without

compulsion (*People v. Prude* (1977), 66 Ill. 2d 470, 363 N.E.2d 371) or whether the defendant's will was overborne at the time he confessed so as not to be the product of rational intellect and free will (*Townsend v. Sain* (1963), 372 U.S. 293, 9 L. Ed. 2d 770, 83 S. Ct. 745; *People v. O'Leary* (1970), 45 Ill. 2d 122, 257 N.E.2d 112).

A reviewing court will not disturb the trial court's determination in this regard unless it is against the manifest weight of the evidence. (*People v. Payton* (1984), 122 Ill. App. 3d 1030, 462 N.E.2d 543.) As on the motion to quash arrest, the reviewing court may consider the evidence heard by the trial court both at the suppression hearing and at trial in reviewing the trial court's finding that defendant's statements were voluntarily obtained. See *Caballero*, 102 Ill. 2d at 35-36, 464 N.E.2d at 229.

■ Defendant's testimony that the police physically beat him, forced him to remain naked for a long period of time, and threatened to remove custody of his children and incarcerate his pregnant girl friend if he did not make a statement—the content of which included that he had robbed the victim and left through a window—conflicted with the testimony of the three detectives who denied these actions and denied witnessing others perform these actions. Defendant maintains that the trial court's finding that the police detectives were more credible than defendant is against the manifest weight of the evidence since the record is replete with evidence corroborating his claims.

After carefully reviewing the record under our limited role on review, we cannot conclude that the trial court's ruling on the credibility of the witnesses is against the manifest weight of the evidence. The evidence to which defendant refers as corroborating his testimony lacks objective proof of the actions of which he complains.

Wright, while testifying that he heard yelling and slapping noises from the direction of defendant's interview room, did not observe defendant being struck or identify defendant's voice. Wright also admitted that his interview room door was closed at the time and that his room was located at least five doors from defendant's room. Wright's testimony that he observed defendant naked for two to three hours contradicts the one-hour period testified to by defendant. Sappington's testimony that she observed swelling on defendant's face the morning of December 3 is inconsistent with the intake report on December 5, 1985, which did not report any physical injuries, bruises or swelling. Moreover, even though Wright and Sappington had implicated defendant in the crime, both of these witnesses had a close relationship with defendant.

The medical evidence offered at the suppression hearing and at trial proves only that defendant reported an ear injury on December 5, 1985, and that, on December 13, 1985, he had an ear injury which he claimed was caused by the Chicago police department. The examining doctor could not determine the cause of the injury or when the injury was inflicted.

Finally, during defendant's court-reported statement conducted by the assistant State's Attorney, defendant repeatedly stated that police exerted no coercion and had treated him well. Defendant also made corrections to the statement and signed each page of the statement. The fact that the statement was in a detailed "question and answer" form, rather than merely in written summary form, and the fact that the statement conflicted with certain evidence within police knowledge bolster police testimony that they did not coach defendant.

■■ ■ Defendant next contends that he was denied a fair trial by the trial court's failure to inquire into prospective jurors' bias regarding the State's burden of proof and defendant's presumption of innocence. Our supreme court, in *People v. Zehr* (1984), 103 Ill. 2d 472, 477, 469 N.E.2d 1062, 1064, outlined six points of interrogation for prospective jurors: (1) the defendant's presumption of innocence; (2) that a defendant is not required to offer any evidence on his own behalf; (3) their knowledge of the premise that a defendant must be proved guilty beyond a reasonable doubt; (4) whether they would hold a defendant's failure to testify against him; (5) whether they would have any prejudice against returning a verdict of not guilty were they to find the State failed to sustain its burden beyond a reasonable doubt; and (6) whether they would have any prejudice against returning a verdict of guilty were they to find the State sustained its burden of proof.

In *Zehr*, defense counsel had requested that the trial court submit such inquiries to the prospective jurors. Defendant here failed to raise the issue at trial or in his post-trial motion. Defendant, however, has presented an argument that the waiver rule of *People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, would not apply in this context. We do not believe it is necessary that we delve into the waiver issue in the case at bar because the supreme court, in *People v. Emerson* (1987), 122 Ill. 2d 411, 522 N.E.2d 1109, has found nearly identical remarks as those here, made by the same trial judge, to satisfy the *Zehr* requirements.

In *Emerson* (122 Ill. 2d at 426-27, 522 N.E.2d at 1114), the supreme court explained that *Zehr* was not an "attempt to prescribe a precise formula for trial judges to use in ascertaining jurors *** atti-

tudes" and found the trial judge's opening remarks to the venire as a whole satisfied the purpose expressed in *Zehr*. A comparison of the opening remarks here, as set forth below, to those fully outlined in *Emerson* demonstrates that the remarks are virtually identical:

"THE COURT: It is your duty, it is your responsibility to follow the law as I give it to you. When I tell you the law is a particular way, that is the way it is. You must accept the law as I give it to you. When I tell you that the law is a particular way, that is the way it is. As I tell all jurors, I am the boss of the law. So considering that, is there any juror including the jurors sitting out in the audience, that will not follow the law as I give it to them? Anybody? (No Response.)

You might think that is a foolish question, but I can remember in the 1960's, we actually did have people that raised their hands and said they would not follow the law. Thank God the 60's have passed. Thank God the people do follow the law as the judge gives it to them. That is the only way our system of justice has functioned over many, many years. Since I told you what my function is, then what is your function? Your function, in simple terms, you are the boss of the facts. In other words, you will judge the facts as you hear them from the witness stand, by the law which I give to you, and your common sense, and you will decide whether the defendant is guilty or not guilty of the charge against him.

\* \* \*

\*\*\* The defendant has entered a plea of not guilty. Under the law, he is presumed to be innocent; until the People of the State of Illinois prove him guilty beyond a reasonable doubt, he is not guilty; so if I were to take the first twelve jurors, the ones whose names were called, and tell you to go back to the jury room at this time and give me a verdict, I am sure most of you would look at me and say, what is that man talking about? How can we possibly give a verdict at this time, since we haven't heard anything. We would be absolutely wrong. If I were to send you back to the jury room at this time and tell you to give me a verdict at this time, your verdict would have to be not guilty, because you haven't heard anything. Until the State proves him guilty beyond a reasonable doubt, he is not guilty. That is the law. That is what you must accept.

At the conclusion of this case I will give you certain written instructions which you will take with you back to the jury room with you when you begin your deliberations. \*\*\* The only thing

you have to do is understand English, follow the English language."

Because such remarks have been previously held to satisfy the *Zehr* requirements, defendant's claim lacks merit.

We turn now to defendant's contentions regarding the written instructions submitted to the jury. The jury was tendered IPI instructions on the offenses of murder and voluntary manslaughter, unreasonable belief of justification (IPI Criminal 2d Nos. 7.02, 7.06), as well as an instruction on the issue of self-defense (IPI Criminal 2d No. 24—25.06). Defendant contends that the jury instructions on murder and voluntary manslaughter/unreasonable belief in justification were deficient and that a voluntary manslaughter instruction based upon provocation should have been tendered to the jury.

Addressing defendant's former contention, the Illinois Supreme Court, in *People v. Reddick* (1988), 123 Ill. 2d 184, 526 N.E.2d 141, found the IPI instructions on murder and voluntary manslaughter incorrectly set forth the State's burden of proof regarding the mental states necessary to reduce a murder charge to manslaughter. Defendant argues that *Reddick* should be given retrospective application and found to be reversible *per se*. The State, on the other hand, urges that *Reddick* be given only prospective application and that, even if retroactively applied, the error be deemed harmless based upon the overwhelming evidence of defendant's guilt of murder and based upon the felony murder charge submitted to the jury.

In *People v. Flowers* (1989), 192 Ill. App. 3d 292, 548 N.E.2d 766, we determined in a case of first impression that *Reddick* is to be applied retrospectively to a defendant's collateral attack on his conviction. In the supreme court's recent reversal of our decision, the court held that *Reddick* is to be applied prospectively in collateral proceedings. (*People v. Flowers* (1990), 138 Ill. 2d 218.) The court has yet to decide whether *Reddick* is to be applied retrospectively on direct appeals, although it has granted leave to appeal in a number of such cases which have been consolidated for appeal purposes. *E.g., People v. Shields* (1989), 181 Ill. App. 3d 260, 536 N.E.2d 999; *People v. Fercsi* (1989), 182 Ill. App. 3d 13, 537 N.E.2d 912.

In our district, appellate courts have found *Reddick* to apply retrospectively to direct appeals. (*People v. Brooks* (1988), 175 Ill. App. 3d 136, 529 N.E.2d 732; *People v. Shields* (1989), 181 Ill. App. 3d 260, 536 N.E.2d 999; *People v. Fercsi* (1989), 182 Ill. App. 3d 13, 537 N.E.2d 912; *People v. Thomas* (1989), 185 Ill. App. 3d 1050, 542 N.E.2d 100; *People v. Forbes* (1990), 205 Ill. App. 3d 851.) We follow this precedent.

Despite the retroactive application of *Reddick*, numerous appellate courts have held that a murder conviction need not be reversed if the *Reddick* error can be deemed harmless. (*Forbes*, 205 Ill. App. 3d 851; *People v. Riggins* (1990), 205 Ill. App. 3d 904; *People v. Nunn* (1989), 184 Ill. App. 3d 253, 541 N.E.2d 182; *People v. Beacham* (1989), 189 Ill. App. 3d 483, 545 N.E.2d 392; *People v. Skipper* (1988), 177 Ill. App. 3d 684, 533 N.E.2d 44 (supplemental opinion (1989), 177 Ill. App. 3d 688, 533 N.E.2d 46); *People v. Carter* (1988), 177 Ill. App. 3d 593, 532 N.E.2d 531.) To constitute harmless error, it must be demonstrated that the trial's result would not have been different if the jurors had been given the correct instruction. *People v. Fierer* (1988), 124 Ill. 2d 176, 187, 529 N.E.2d 972, 976.

Before considering whether the *Reddick* error may be deemed harmless in the instant case, we will address defendant's second claimed instructional error—the court's refusal to tender a manslaughter instruction based upon provocation. The State initially objects to our consideration of this issue on the ground that defendant has waived the issue by failing to include in the record the actual instruction defendant tendered to the court.

Defense counsel submitted as part of the record a jury instruction on voluntary manslaughter based upon intense provocation, but filed a motion at oral argument to withdraw the instruction because they learned, upon the filing of appellate briefs in this action, that an instruction pertinent to another case had been submitted. The transcript of proceedings reveals that the defense tendered a voluntary manslaughter based upon sudden intense passion which the court reviewed and rejected, but it does not reveal the instruction's content, and it is not clear whether the tendered instruction was an IPI instruction or a modified instruction. Because the record clearly discloses that the trial court rejected the instruction tendered by defendant, and in light of the magnitude of the issue raised by defendant on appeal, we do not believe the lack of the actual instruction precludes review here. *Cf. People v. Gleckler* (1980), 82 Ill. 2d 145, 157, 411 N.E.2d 849, 854.

A trial court's discretion to tender a jury instruction on voluntary manslaughter is controlled by clear guidelines. Where a defendant has presented "some evidence" of serious provocation, the trial court must tender the instruction. (*People v. Austin* (1989), 133 Ill. 2d 118, 124, 549 N.E.2d 331, 334.) Under the statute in effect at the time, a person who kills an individual without legal justification commits voluntary manslaughter when he acts under a sudden and intense passion resulting from serious provocation by the individual

killed. (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a)(1).) The statute defines "serious provocation" as "conduct sufficient to excite an intense passion in a reasonable person." (Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a).) Only that provocation which the law recognizes as being reasonable and adequate will relieve the slayer from liability for murder. *People v. Matthews* (1974), 21 Ill. App. 3d 249, 314 N.E.2d 15.

 Defendant maintains that sufficient evidence existed that he stabbed the victim during the heat of mutual combat to warrant the manslaughter/provocation instruction. Although Illinois courts have recognized that evidence of mutual combat may require a manslaughter instruction based upon serious provocation (*Austin*, 133 Ill. 2d 118, 549 N.E.2d 331; *People v. Johnson* (1972), 4 Ill. App. 3d 249, 280 N.E.2d 764), the State argues that the instruction is inappropriate where the evidence demonstrates, as in the case at bar, that a defendant attacks a victim with violence out of all proportion to the provocation. In further response to defendant's contention, the State summarily propounds two other arguments. The State asserts that defendant, since he presented a different self-defense theory at trial, cannot rely on the same body of evidence to support this inconsistent manslaughter theory. Next, the State maintains that, even with a manslaughter instruction, the jury could not have convicted defendant of less than murder in light of the felony murder instruction submitted to the jury.

Courts have defined "mutual combat" as a fight or struggle entered into by both parties willingly or a mutual fight, upon a sudden quarrel and in hot blood, upon equal terms where death results from the combat. (*Austin*, 133 Ill. 2d at 125, 549 N.E.2d at 334; *Matthews*, 21 Ill. App. 3d at 253, 314 N.E.2d at 15.) Courts have found that the mutual combat aspect of provocation does not apply where the manner in which the accused retaliated is out of all proportion to the provocation, especially where the homicide is committed with a deadly weapon. *Austin*, 133 Ill. 2d at 126-27, 549 N.E.2d at 335; *People v. Neal* (1983), 112 Ill. App. 3d 964, 967-68, 446 N.E.2d at 270, 274; *Matthews*, 21 Ill. App. 3d at 252-53, 314 N.E.2d at 19.

The evidence of mutual combat to which defendant refers is his testimony at trial that the victim grabbed him when he refused to have anal intercourse and attempted to leave, that he could not escape due to the locked door, that they wrestled for 10 minutes and fought over a knife the victim had brandished, and that defendant, after securing the knife, swung the knife at the victim as the victim repeatedly "came at" him. The State points out that defendant never testified that he felt any sudden or intense passion, that only defend-

ant possessed a deadly weapon at the time he stabbed the victim, and that the multiple stabbing was completely out of proportion to the provocation.

██ We believe the victim's conduct *as testified to by defendant* is sufficient to excite an intense passion in a reasonable person. The testimony indicates that the victim willingly engaged in the combat and, in fact, himself initiated the combat when defendant refused to engage in a sexual act with him. We do not believe the fact that at the time of the stabbings the victim was unarmed renders the fight on "unequal terms" or that the multiple stab wounds demonstrate a disproportionate response to the victim's aggression since defendant's testimony indicates that the victim prevented defendant's escape, brought the deadly weapon into the fight and indicated a willingness to use the weapon, and repeatedly charged at defendant despite defendant's possession of the knife.

Thus, defendant's testimony provided "some evidence" of serious provocation to warrant a jury instruction on manslaughter based on sudden and intense provocation. The failure to give this instruction, however, does not necessarily constitute reversible error. An error in refusing to submit an instruction on voluntary manslaughter may be harmless where evidence of guilt of murder is so overwhelming that the jury's verdict would not have been different had the instruction been given. *People v. Bailey* (1986), 141 Ill. App. 3d 1090, 1104, 490 N.E.2d 1334, 1344; *People v. Moore* (1983), 95 Ill. 2d 404, 410, 447 N.E.2d 1327, 1330.

██ After reviewing the evidence adduced at trial to determine whether the failure to tender a manslaughter/provocation instruction, as well as the tendering of the deficient murder and manslaughter instructions (unreasonable belief), constitute harmless error, we find the evidence of defendant's guilt of murder is overwhelming. Witness testimony, defendant's admissions, and the physical evidence demonstrate that the jury would not have believed defendant's testimony of the events which could give rise to a manslaughter verdict based upon provocation or based upon unreasonable belief in justification.

Wright, who shared a home with defendant, testified that defendant stated his intent to rob homosexuals shortly before the incident. Wright admitted that he testified before the grand jury the day after the arrests that defendant told him that he had grabbed the victim by the neck when the victim entered the apartment door and pushed him into the living room and that, when the victim tried to defend himself with a knife, defendant took the knife and stabbed him. Contrary to the victim's repeated aggression and

the ongoing battle described by defendant, a witness testified that he observed through the apartment front window a man with a knife and that the man, upon hearing a person outside, turned off the light and demanded that the victim "be quiet." He also heard the victim's cries for help as he looked through the front window and subsequently when he peered through the back window and observed only a light emanating from the bathroom.

Further, Wright testified that defendant told him he had left, re-entered the victim's apartment through a window, and then tied the victim up. The witness on the scene also testified that the screen on the back window was broken between the time he heard the intruder and the time he returned with police.

Physical evidence also refutes defendant's account. In contrast to defendant's testimony that the victim approached him in his underwear to demand sex, the police recovered the victim's clothes which were stained with blood. Police examination of the door revealed no necessity for a key to exit. While defendant testified the stabbings occurred in the living room, police found only a small amount of blood in the living room. Police discovered a large amount of blood in the bathroom where the victim was tied to the drainpipe, and the medical examiner testified that the inflicted wounds caused death within minutes.

Police also found wounds on the victim's arms typical of a defense against a knife attack. The medical examiner testified to a cluster of stab wounds to the lower back and stated that it would be improbable that these wounds were inflicted by a person simultaneously being grabbed in a bear hug. Finally, the over 25 knife wounds received by the victim makes defendant's testimony that the victim repeatedly charged him incredible.

In view of our holding that the instructional errors were harmless based upon the overwhelming evidence of defendant's guilt of murder, it is unnecessary to address the remaining issues raised by the State in response to defendant's contentions regarding the tendered jury instructions.

■■ Finally, defendant contends that his sentence for armed robbery must be vacated and remanded for resentencing because the extended-term statute under which he was sentenced permits an extended-term sentence only "for the class of the most serious offense of which the offender was convicted" (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—2). In *People v. Jordan* (1984), 103 Ill. 2d 192, 205-06, 469 N.E.2d 569, the supreme court interpreted the language quoted above to mean that an extended-term sentence is improper for offenses that

do not belong to the most serious class of offenses of which a person is convicted. In the case at bar, only the murder conviction belongs to the most serious class of offenses.

██ The parties here dispute whether the trial court in fact imposed a 60-year sentence on the armed robbery conviction or whether the trial court failed to impose any sentence on that conviction. The transcript of the sentencing hearing reflects only a discussion of the nature of the murder, followed by the imposition of the 60-year imprisonment term. The court sheets reflecting the orders entered that day also indicate only the 60-year sentence without mention of the corresponding convictions. The mittimus to the Illinois Department of Corrections reflects the 60-year sentence, the judgment on the verdict and sentence, and sets forth the murder and armed robbery convictions.

As the related orders do not refute the court's omission at the sentencing hearing to consider the armed robbery conviction, we cannot conclude that the court imposed a sentence on that conviction. In *People v. Flores* (1989), 128 Ill. 2d 66, 538 N.E.2d 481, the supreme court restated the principles that an appeal cannot be entertained in the absence of a final judgment and that no final judgment in a criminal case exists until the imposition of a sentence on the conviction. Defendant's appeal as to his armed robbery sentence, therefore, must be dismissed.

Accordingly, we affirm the defendant's conviction of murder and 60-year imprisonment sentence and dismiss defendant's appeal involving his armed robbery conviction.

Affirmed in part; appeal dismissed in part.

CAMPBELL and MANNING, JJ., concur.